Carl F. THORNTON, Plaintiff-Appellant,

v.

J. Leo BUCHMANN, Robert Bosman, Arthur Riley, Gordon Elsen, Robert Petersen and Abe Toigo, all individually and as police officers of the city of Kenosha, jointly and severally, Defendants-Appellees.

No. 16235.

United States Court of Appeals Seventh Circuit.

Feb. 5, 1968.

Alvin R. Ugent, Sidney Podell, Podell & Ugent, Milwaukee, Wis., for plaintiff-appellant.

David L. Phillips, Burton A. Scott, Phillips & Richards, Kenosha, Wis., for defendants-appellees.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action against police officers for deprivation of constitutional rights.[1]

During the early hours of January 3, 1964, Thomas Heather was robbed and shot, at the filling station in Kenosha where he was employed. He died without regaining consciousness. The present action concerns activities of the city police in connection with their investigation of the homicide.

Plaintiff Carl Thornton worked part time at the same filling station as Heather, and also worked at the American Motors plant on a shift ending at 12:30 a. m. He was not on duty at the filling station at the same hours as Heather, but often worked on his own car there at times when Heather was on duty. At about 6:30 p. m. January 6, city detectives came to the plant and asked if Thornton would be willing to go to the police station and answer some questions. He said "yes" and went. There is no evidence that he was deprived of liberty at that time.

About two hours later Thornton thought the questioning had ended and got up to leave. He was told to remain. It is clear that he was no longer free from restraint. He signed two consents to "lie detector" tests and they were carried out. At some time between midnight and 1:20 a. m., an officer told him he was under arrest. No warrant had been issued. He spent the night in a cell, and was taken the next day to the state crime laboratory at Madison. He

admitted at trial he had been perfectly willing to go to Madison and had so told the officers. After another "lie detector" test at Madison, he was brought back to Kenosha and released about 7 p. m., with instructions to return the next morning.

He did not return, however, and has not again been taken into custody. At some later date, the officers discussed the evidence with the district attorney, who declined to issue a warrant.[2] The police file contains a notation that the case against Thornton is "dismissed" but "could be reopened."

The foregoing facts are undisputed in the present record.

Trial was begun before a jury. Plaintiff Thornton not only proved that he had been arrested without a warrant, detained for some 18 or 19 hours after the formal arrest, and then released and not further prosecuted, but his counsel also inquired of several defendants, whom he had called to testify as adverse parties, about the basis for the their actions. As a result many of the facts asserted by defendants as justification were in the record when plaintiff rested.

At the close of plaintiff's case, upon motion by defendants, the court directed a verdict. Plaintiff has appealed from the judgment accordingly entered.

The district judge was satisfied that the evidence disclosed, as a matter of law, that the defendant officers had probable cause to arrest Thornton.

 "Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. Brinegar

---

1. 42 U.S.C. § 1983.

2. These events occurred before the decision in State ex rel. White v. Simpson

(1965), 28 Wis.2d 590, 137 N.W.2d 391 holding that a district attorney is not the type of officer who may properly issue a warrant.

v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879; Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134. 'The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating * * * often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice'. Brinegar v. United States, supra, at 176 [69 S.Ct. 1302, at 1311]." [3]

The successive stages of the transaction under scrutiny may be outlined as follows: (1) From 6:30 or 7 p. m. to 8:30 or 9 p. m. Thornton was questioned at the police station. His presence was voluntary. (2) At about 8:30 or 9 the officers told Thornton he was not free to leave, and questioning continued. (3) Some time between midnight and 1:20 a. m., the officers formally arrested Thornton and he remained in custody for 18 or 19 hours thereafter.

The distinction, if any, between detention for questioning and arrest, and between the extent of information required to justify either, has not been decided by the Supreme Court. There were two items of information acquired during the questioning and described as parts of the basis for the arrest. We shall assume the officers did not have these items until after Thornton was told he could not leave, though the testimony is not clear on the point.

Defendant Bosman was the officer immediately in charge. He described the information he had, in substance, as follows: Thornton was an employee at the filling station. Two men had reported seeing a man at the station shortly before 3 a. m. the morning Heather was shot. They were not in a position to see his face, but they believed the man was Thornton. The officers who answered the call to the filling station passed an old model Plymouth near the station, but proceeding away from it. It was re-ported that on the morning after the shooting, Thornton mentioned to someone that he had heard on the radio that Heather had been shot, but the police learned that the radio station did not give the name on that broadcast. Heather had been shot with a 22-caliber revolver. About a week earlier, Thornton had told the proprietor of the station that he kept a 22-caliber revolver under the seat of his car.

The two items of information, previously referred to, which were produced during the questioning, were (1) that Thornton denied being at the station the morning of January 3, but when he was told of the report that he had been seen, he began, and then abruptly stopped, a statement which assumed a fact he would probably have not known if he had not been present, and (2) that although the lie detector tests were considered inconclusive, the deputy sheriff who administered them believed that Thornton was not telling the truth.

■■ We consider the information described by Bosman sufficient to be probable cause for arrest, whether the last two items be considered or not. It necessarily would follow that whether or not the standard of justification for detention for questioning is less strict than for arrest, the detention for questioning was not unreasonable.

■ Plaintiff correctly asserts that the district judge, and we, must, for the present purpose, review the evidence in the light most favorable to plaintiff. He appears to contend that the jury would be free to disbelieve Bosman's testimony that at the time of the arrest the police had the information he described. Plaintiff suggests the police may have discovered some of it later.

■■ Granting, however, that a jury may ordinarily disbelieve testimony at least where the witness, not otherwise impeached, is interested in the outcome and gives testimony which will serve his interest, we think there is sufficient corroboration here, in large measure

3. Beck v. State of Ohio (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142.

from Thornton's own testimony, so that the jury could not properly have disregarded Bosman's testimony.

Thornton admitted at the trial that he had a black 1939 Plymouth, and sometimes worked on it at the filling station at off hours. He knew of only one other similar car being operated in Kenosha in 1964. He admitted that the radio newscast he heard did not include the name of the station nor of the victim, and that he mentioned this news to a Mr. Jonas, though he explained at the trial that he had assumed the identity of the station and victim because this was the only all night station in the area referred to. Thornton said he knew the two men who reported seeing someone they thought was he; they were customers of the station; he sometimes saw them elsewhere; and he would have had no trouble identifying them. He conceded he might have said something to the proprietor about not being afraid to work on his car at night because he had a gun for protection, but didn't remember if he did or did not say he kept a 22-caliber revolver under the seat of his car. He admitted owning such a revolver at his home although he denied ever having had it in Kenosha. He was asked what questions were asked him by the officers, but answered only in the most general terms. There was nothing in his testimony to indicate that the officers had not questioned him about the reports that he had been seen, nor to suggest that they did not then have any of the other information Bosman claimed.

■ This is an example of a type of case which arises with some frequency, where it is a close legal question whether there is any view of the evidence which would support a verdict in favor of one party, and where, at best for such party, such evidence would be extremely weak and a verdict for him highly improbable. We think it much the better practice for a trial court in these circumstances to permit the case to go to the jury, and

rule on the sufficiency of the evidence afterward, if necessary. This may save a retrial where the trial judge considers there is no jury issue, but the appellate court overrules him. In the instant case, moreover, had the district judge reserved his ruling until after verdict, the defendants' case would have been fully presented, and may well, we surmise, have made it even more plain that defendants had, at the time of the detention and arrest the information they claimed to have had.

■ Plaintiff contends that he should have been taken promptly before a magistrate, and it would surely have been possible to do so in the morning of the day they went to Madison. We are concerned, in this case, only with the extent of plaintiff's detention, and not with the use against him upon criminal trial of any statement he made. Under all the circumstances, including plaintiff's admitted willingness to journey to Madison, apparently in the hope that the "lie detector" test would clear him, the length of the detention was not unreasonable.

■ It is clear that the officers did not give plaintiff the warnings now required by Miranda v. State of Arizona.[4] This would prevent the use of his statements in a criminal trial if hereafter commenced, but we think it has no significance in the present case.

■ Neither the fact that the district attorney declined to issue a warrant, nor the fact that the police presently think they have no case establishes that the police did not have probable cause to arrest. It seems clear that the investigation never produced evidence of weight and quality sufficient to secure a conviction, and this is doubtless the explanation for the failure to proceed further. There is a "large difference" between what is required to prove guilt and what is required to show probable cause for arrest.[5]

The judgment appealed from will be affirmed.

4. (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974.

5. Brinegar v. United States (1949), 338 U.S. 160, 173, 69 S.Ct. 1302, 93 L.Ed. 1879.