Steve RODGERS, Plaintiff,

v.

LINCOLN TOWING SERVICE, INC., an Illinois corporation; The City of Chicago; Philip R. Pagano, Detective of the Police Department of the City of Chicago; Steve Mash, Manager, Lincoln Towing Service, Inc.; William McGarry, Detective of the Police Department of the City of Chicago; Stephen Eisgrau; and Police Commissioner of the City of Chicago, Defendants.

No. 83 C 7038.

United States District Court, N.D. Illinois, E.D.

March 29, 1984.

On Motion For Reconsideration Sept. 25, 1984.

Mark H. Hellman, Judith L. Grubner, Stern & Hellman, Judith S. Sherwin, Gutstein & Sherwin, Chicago, Ill., for plaintiff.

Paul M. Sheridan, Asst. Corp. Counsel, Chicago, Ill., for defendants City of Chicago, Philip R. Pagano, William McGarry, and Police Commissioner.

Jon W. Knudson, Law Offices of Jon W. Knudson, Chicago, Ill., for defendants Lincoln Towing Service, Inc., Steve Mash, and Stephan Eisgrau.

## MEMORANDUM OPINION

KOCORAS, District Judge:

In this civil rights action the plaintiff sues the City of Chicago, the superintendent of the Chicago Police Department, two individual Chicago police officers, a private corporation, and two of its employees over the events arising from the towing of his car from the parking lot of the Belden Corned Beef Center on October 7, 1982.

The plaintiff has put together a lengthy complaint that asserts claims under virtually every conceivable theory. Using the Bill of Rights as a starting point, the plaintiff claims under 42 U.S.C. § 1983 that the defendants violated his rights under the first, fourth, fifth, sixth, seventh, and eighth amendments. Not overlooking the later amendments, the plaintiff adds a claim for denial of due process under the fourteenth amendment. The plaintiff next invokes 42 U.S.C. §§ 1985 and 1986, charging that the defendants engaged in a conspiracy to abridge his rights because of their animus towards a class to which he belongs. For good measure, the plaintiff also has thrown in an array of pendent claims under Illinois law. To encompass all of these charges, the plaintiff's amended complaint runs seventeen pages in length. This complaint is not the product of a pro se plaintiff untutored in the law. The plaintiff in this case is represented by not one but three lawyers, two of whom are members of the bar of this court.

The matters now before the court are motions by the various defendants to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

In order to place the legal issues in proper perspective it is necessary to set out in some detail the facts alleged in the amended complaint. The operative facts—as distinct from the mere legal conclusions with which this complaint is riddled, and upon which the pleader may not rely, *see, e.g., Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, at 654–655 (7th Cir.1984)—are as follows. The plaintiff parked his car in the Belden Corned Beef Center's private parking lot and went inside for an hour. When he came out his car was gone. He learned that his car had been towed away by defendant Lincoln Towing Service, a private company retained by the Corned Beef Center to keep its lot clear of illegally parked cars. The plaintiff went to Lincoln Towing's place of business, paid the towing fee, and retrieved his car. He then went home.

A week later the plaintiff was called on the telephone by Detective Pagano of the Chicago Police Department. Pagano told the plaintiff that a complaining witness had identified him as the person who had recently thrown paint on the Lincoln Towing building. Pagano asked the plaintiff to come to the police station to discuss the matter and warned him that a warrant might be issued for his arrest. Pagano did not advise the plaintiff of his constitutional rights during this telephone conversation. Three days after Pagano called, the plaintiff finally showed up at the station. No warrant had been issued in the meanwhile.

At the station, Pagano and another detective by the name of McGarry questioned the plaintiff for an hour regarding the complainant's accusation that he had thrown paint on the Lincoln Towing building. The officers did not advise the plaintiff of his constitutional rights, and he steadfastly denied any knowledge of the vandalism. Two employees of Lincoln Towing were present as the plaintiff was questioned, and they demanded that the police file a complaint against him. Detective Pagano finally drafted a complaint, and it was signed by one of the Lincoln Towing employees as the complainant.

The plaintiff was then placed in a cell at the station, where he was held until he was released at 5 a.m. the next morning. Although the plaintiff told Detective Pagano that he had money to post bail, he was not given an opportunity to do so until the morning. The plaintiff was eventually brought to trial on the charge of throwing paint on the Lincoln Towing building and the two Lincoln Towing employees testified against him, but he was found not guilty.

Rule 11 of the Federal Rules of Civil Procedure was amended effective August 1, 1983. As the advisory committee's notes make clear, this amendment was enacted for the specific purpose of curbing the filing of complaints and other papers that lack a proper foundation in law and fact. The amendment represented a substantial tightening of the standards for attorney conduct over those which had prevailed under former rule 11. In addition to the affirmative duty of prefiling inquiry into the facts and law that it places upon attorneys, the new rule places an obligation on the district courts to step in and police abuses. *See* Fed.R.Civ.P. 11 (as amended Apr. 28, 1983, effective Aug. 1, 1983) advisory committee notes on 1983 amendment ("The detection and punishment of a violation of the signing requirement, encouraged by the amended rule, is part of the court's responsibility for securing the system's effective operation."); Miller & Culp, *Litigation Costs, Delay Prompted the New Rules of Civil Procedure,* Nat'l L.J., Nov. 28, 1983, at 24, 34 ("Note the ... words 'its own initiative,' which is an attempt to place an obligation for policing Rules 7 and 11 on the court.").

The amended complaint in this case was filed four months after the new rule became effective. At least with respect to the federal claims, the complaint is in direct contravention of the rule. Most of those claims have no arguable basis in existing

law. A reasonable amount of research before the document was drafted, which is all the new rule requires, would have revealed that to the plaintiff's three lawyers.

■ The problems begin with the laundry list of claims under section 1983. Some of them are patently frivolous. For example, there is no basis whatever for claiming a first amendment violation in the facts alleged. Not a single allegation even remotely suggests such a violation. Similarly, there is not the slightest justification for a seventh amendment claim. That amendment provides the right to a jury trial in certain civil cases tried in the federal courts. *See, e.g., United States v. Hutul,* 416 F.2d 607, 626 (7th Cir.1969), *cert. denied,* 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970); *Gustafson v. Peck,* 216 F.Supp. 370, 371 (N.D.Iowa 1963). It is not possible that a reasonable lawyer could read that amendment and think it had been violated under the facts of this case. It is totally irrelevant in these circumstances. Nevertheless, it is cited in this complaint as one of the grounds for the plaintiff's federal claims.

■ The eighth amendment proscribes cruel and unusual punishment, excessive bail, and excessive fines. Nothing in the facts alleged fits within the ambit of the kind of conduct the cases say is prohibited by this amendment. *See, e.g., Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 ("Today the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' ... or are grossly disproportionate to the severity of the crime...." (citations omitted)); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the eighth amendment); *Hickman v. Hudson,* 557 F.Supp. 1341, 1344 (W.D.Va.1983) ("[T]he unjustified or excessive use of force or infliction of bodily harm upon a prisoner amounts to cruel and unusual punishment when such is inspired by malice or sadism for the purpose of causing harm...."). *See also State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1145–46 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983); *Risner v. Duckworth,* 562 F.Supp. 378 (N.D.Ind.1983); *Emory v. Duckworth,* 555 F.Supp. 985 (N.D.Ind.1983). Moreover, since the plaintiff in this case had not been found guilty of any crime during the time he was at the police station he cannot assert a claim based on the eighth amendment's prohibition against cruel and unusual punishment in any event. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977); *Barnier v. Szentmiklosi,* 565 F.Supp. 869 (E.D.Mich.1983); *Watson v. McGee,* 527 F.Supp. 234 (S.D. Ohio 1981).

■ The sixth amendment right to counsel does not attach until the initiation of adversary judicial criminal proceedings. *See, e.g., Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). And as the Seventh Circuit held last July, there is no sixth amendment right "to place a phone call, be it to an attorney or family members." *State Bank of St. Charles v. Camic, supra,* at 1145 n. 2. *See also Guenther v. Holmgreen,* 573 F.Supp. 599 (W.D.Wis.1983). There is thus no basis for a sixth amendment claim here.

■ The plaintiff's fifth amendment claim based on the failure of the police to give him the warnings required under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is equally unsupported by a good legal foundation. The judicially created right to such warnings does not arise absent custodial interrogation. A person is not in custody for *Miranda* purposes when the police merely call him on the telephone. Nor is a suspect who voluntarily presents himself at the police station and remains free to go until a formal complaint is signed in custody. *See, e.g., California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Or-*

*egon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). *Cf. Minnesota v. Murphy,* — U.S. —, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). More importantly, however, even if it were to be assumed for the sake of argument that the plaintiff should have been given *Miranda* warnings at some point, the failure to give them did not deprive him of any constitutional right. There is no constitutional right to *Miranda* warnings. *See, e.g., Guenther, supra,* at 601 (citing *Thornton v. Buchmann,* 392 F.2d 870, 874 (7th Cir.1968); *O'Hagan v. Soto,* 523 F.Supp. 625, 629 (S.D.N.Y.1981)). Further, it is clear from the plaintiff's own allegations that he never confessed to anything. When the police inquired, he denied any knowledge of the paint throwing incident. It therefore can hardly be suggested that he was compelled to incriminate himself.

■ As for his fourth amendment claim, the plaintiff apparently is relying, at least in part, on the theory that he was arrested in violation of the fourth amendment the moment the police officer telephoned him and asked him to come to the station. As an initial matter, entirely apart from the question of whether the officer had some objective justification for making this call in fourth amendment terms (i.e., probable cause or reasonable suspicion that the plaintiff had committed a crime), there is the question of whether this may be viewed as a "seizure" that brings the fourth amendment into play. The plaintiff blithely assumes that the officer's telephone call amounted to a seizure. But even a casual perusal of recent fourth amendment cases reveals the legal infirmity of this position. Fourth amendment doctrine has for some time been moving in a direction that is quite unsupportive of a claim that a person can be "seized" by means of a mere telephone call. In *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980), the Supreme Court said:

> We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.... As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
>
> ....
>
> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

This view was adopted by the Seventh Circuit in *United States v. Black,* 675 F.2d 129 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). The court concluded that "as long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated." *Id.* at 134. *See also United States v. Notorianni,* 729 F.2d 520 (7th Cir.1984); *United States v. Morgan,* 725 F.2d 56 (7th Cir. 1984); *United States v. Cordell,* 723 F.2d 1283 (7th Cir.1983). State courts have reached the same conclusion in a variety of contexts. *See, e.g., People v. Reed,* 104 Ill.App.3d 331, 60 Ill.Dec. 80, 432 N.E.2d 979 (1982); *People v. Miller,* 89 Ill.App.3d 973, 45 Ill.Dec. 42, 412 N.E.2d 175 (1980), *cert. denied,* 454 U.S. 871, 102 S.Ct. 339, 70 L.Ed.2d 175 (1981). Even in the heyday of fourth amendment expansionism, it was never thought that all contacts between the police and persons they suspected of criminal activity constituted seizures under the fourth amendment. As Justice White observed in his concurring opinion in *Terry v. Ohio,* 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968), "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *See also Dunaway v. New York,* 442 U.S. 200, 222, 99 S.Ct. 2248, 2261, 60 L.Ed.2d 824 (1979) (Rehnquist, J.,

dissenting) ("There is obviously nothing in the Fourth Amendment that prohibits police from calling from their vehicle to a particular individual on the street and asking him to come over and talk with them; nor is there anything in the Fourth Amendment that prevents the police from knocking on the door of a person's house and when the person answers the door, inquiring whether he is willing to answer questions that they wish to put to him."). Just as a citizen approached on the street by a policeman ordinarily is under no compulsion to cooperate and may go on his way, the plaintiff in this case was free to decline the officer's request to come to the station and could have demanded that the officer secure his presence by means of an arrest pursuant to a warrant if he wanted to talk to him. There is not even a question in this case of whether the plaintiff thought he was free to walk away from the officer. There was no need to walk away. The officer certainly was not in a position to exert any physical control over the plaintiff. *See, e.g., Curran v. Dural,* 512 F.Supp. 699, 703 (E.D.Pa.1981) (no arrest where there was no confrontation between plaintiff and officer in which officer could have restrained plaintiff's freedom). Moreover, in contrast to the usual situation in which an officer is physically present and displays his badge to a person he wants to question, the plaintiff here had no way of knowing that the strange voice on the other end of the line actually was a police officer. If the plaintiff did not want to listen to what the caller was saying he had but to hang up the phone. And while the test is an objective one, the conclusion that a reasonable person in the plaintiff's position would have felt entirely free to go about his business after the call is fortified by the plaintiff's subjective reaction. He did not bestir himself to go see what the officer wanted until three days had passed. This cuts the ground from under any notion that he felt himself under the officer's control such that his freedom of movement was restrained.

■ The only reasonable fourth amendment claim in this situation would have to be based on the arrest that eventually occurred at the station. But that arrest, which was made by Pagano, was based on the complaints of two private citizens and was made only after one of them signed a formal, written complaint. Pagano was entitled to believe these witnesses and was not required to credit the plaintiff's denials. *See, e.g., McKinney v. George,* 726 F.2d 1183, at 1187 (7th Cir.1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded."); *Lenard v. Argento,* 699 F.2d 874, 884–85 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) (test is whether officer believed in good faith that arrest was made with probable cause and whether that belief was reasonable, and even though officers did not witness offense themselves it was reasonable for them to believe that probable cause for arrest existed based on statement of complaining witness); *Curran, supra,* at 704 (in assessing existence of probable cause for arrest officer is entitled to give credence to report of complaining witness and to disbelieve exculpatory statements made on suspect's behalf). Thus, there is no fourth amendment violation stated against Pagano. There is similarly no basis for a claim under the fourth or any of the other cited amendments against Detective McGarry, who merely asked the plaintiff some questions.

■ The closest the plaintiff comes to stating a claim against the individual officers is his allegation that he told Pagano he had money to post bail but was held overnight anyway before he was released. Superficially, this has some of the earmarks of a claim for denial of liberty without due process of law. However, in the absence of any allegation that an arrestee in the plaintiff's position should have been released sooner in the normal course of things and that Pagano somehow prevented this, no claim is stated. An arrestee

does not have a constitutional right to be released on bail before the various booking procedures attending the arrest can be completed. In addition, even if the plaintiff was detained somewhat longer than he should have been before he was allowed to post bail, he has a tort remedy for that claim under Illinois law. Therefore, whatever slight deprivation of liberty he may have sustained cannot be said to have occurred without due process of law, and he has no claim under section 1983. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *State Bank of St. Charles v. Camic, supra,* at 1146–48; *Guenther, supra,* at 600–01.

What the plaintiff's lawyers have failed to realize in their haste to throw together a complaint and jump on the section 1983 bandwagon is that "[t]he Bill of Rights and later amendments ... encompass important statements of specific principles. They are not a magical incantation that one recites to draw down the wrath of the Court upon defendants." *Martinez v. Winner,* 548 F.Supp. 278, 287 n. 10 (D.Colo. 1982). The section 1983 claims against the two individual officers appear to have been assembled by reaching into the constitution much as one reaches into a grab bag. And like the trinkets usually found in a grab bag these claims have no real value. Accordingly, the section 1983 claims against the two individual officers are dismissed.

■■■■ The section 1983 claims against the city and the police superintendent fail for lack of a claim against the individual officers. If the officers did not violate the plaintiff's constitutional rights, it makes no difference whether they acted pursuant to a municipal policy. *See, e.g., McKinney, supra,* at 1190. There is no basis for a section 1983 action against anyone if the plaintiff was not deprived of some right secured by the Constitution or laws of the United States. *E.g., Reichenberger v. Pritchard,* 660 F.2d 280 (7th Cir.1981). Moreover, these claims are based on wholly conclusory allegations of a de facto municipal policy. Such boilerplate allegations of an official policy, the existence of which is to be inferred not from something the municipality did but rather from its inaction, constitute one of the most prevalent forms of abuse in section 1983 actions. While paying lip service to the doctrine of *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), allegations such as these are now used to justify the addition of the municipality as a defendant in virtually every section 1983 case against individual municipal employees in a transparent attempt to circumvent the *Monell* Court's explicit rejection of a *respondent superior* theory of municipal liability under section 1983. The municipality can then be dragged into what one respected commentator has called "the swamp of discovery," Miller & Culp, *supra,* at 24, in the hope that it will capitulate or that by rooting through its records the plaintiff's lawyer can unearth something to prop up his otherwise unsupported hypothesis. Because of this enormous potential abuse, a plaintiff wishing to assert such a claim must plead facts tending to show a pattern of illegal conduct going beyond a single incident of wrongdoing. *See Giarrusso v. City of Chicago,* 539 F.Supp. 690 (N.D.Ill.1982); *Rivera v. Farrell,* 538 F.Supp. 291 (N.D.Ill.1982); *Smith v. Ambrogio,* 456 F.Supp. 1130 (D.Conn.1978). *See also Lenard, supra; Wellington v. Daniels,* 717 F.2d 932 (4th Cir.1983). This is nothing more than what is required by rule 11. If a lawyer knows of no instances of similar wrongdoing beyond his client's case and otherwise has no reasonable factual basis for thinking that a de facto municipal policy exists which caused his client's injury, he has no business attaching a conclusory allegation of "policy" to his client's complaint on the off chance that he may be able to dredge up some factual support for that allegation if the court will permit him to conduct exhaustive discovery. This is not to say that lawyer is required to know specific, highly detailed facts before undertaking discovery. It simply means that he has a duty before making such an allegation to make "reasonable inquiry" to see that "it is well grounded in fact." Fed.R.Civ. P. 11. The

section 1983 claims against the city and superintendent are dismissed.

The section 1983 claims against the private defendants are without merit. A private citizen does not become a state actor just because he reports a crime and the police rely on his report to make an arrest. *See, e.g., Grow v. Fisher*, 523 F.2d 875, 879 (7th Cir.1975) ("The mere fact that the individual defendants were complainants and witnesses in action which itself was prosecuted under color of law does not make their complaining or testifying other than what it was, *i.e.*, the action of private persons not acting under color of law."); *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir.1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983."); *Taylor v. Nichols*, 558 F.2d 561, 564 (10th Cir.1977) ("The acts of filing a claim and testifying at trial do not constitute state action. These are private acts."). *See also McKinney, supra,* at 1190. Nor does a private person become a state actor by virtue of a conclusory allegation that he conspired with someone acting under color of state law. *See, e.g., Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204 (7th Cir.1980); *Sparkman v. McFarlin*, 601 F.2d 261 (7th Cir.1979) (en banc). The section 1983 claims against these defendants are dismissed.

As the foundation for his section 1985 conspiracy claims, the plaintiff alleges that he is a member of a class consisting of "persons frequenting the area on the Northside of Chicago who use public parking lots which are patroled [sic] by the LINCOLN TOWING SERVICE and who are a class of persons which Defendant LINCOLN TOWING SERVICE seeks to-harass [sic] and intimidate." Amended Complaint ¶ 24. He says the defendants conspired to deprive him of his rights because he belonged to that class. As an initial matter, the plaintiff's conspiracy allegations are the very sort of hazy, conclusory allegations that have repeatedly been condemned by the courts. Copious use of the words "agreement," "in concert," and "conspiracy" does not create a conspiracy. What is needed are facts, yet facts are few and far between in this complaint, and what factual allegations there are do not suffice to show an actionable conspiracy. *See, e.g., Jafree v. Barber*, 689 F.2d 640, 644 (7th Cir.1982) (conspiracy allegation "must be supported by material facts, not conclusory statements"); *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir.1982) (conspiracy requires factual allegations showing a meeting of minds); *Tarkowski, supra; Sparkman, supra; Benavidez, supra,* at 618 (allegations of conspiracy in conclusory language are not enough); *Tosta v. Hooks*, 568 F.Supp. 616, 620 (E.D.Pa. 1983) (absent allegations of specific conduct terse reference to a conspiracy adds nothing); *Martinez, supra,* at 326 (conspiracies under § 1985 must be pleaded with more than bare allegations that all defendants "conspired" to deprive plaintiff of his constitutional rights).

Beyond that problem, which in itself justifies dismissal of the conspiracy claims, there are more serious flaws. The Supreme Court stated in *United Brotherhood of Carpenters and Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), five months before the amended complaint was filed in this case, that it is a close question whether section 1985(3) was intended to reach any class based animus other than animus against blacks and those who support them. The Court's language in *Scott* leaves little room to think that section 1985(3) reaches any conspiracies other than those motivated by racial bias. *See, e.g., Nilan v. De Meo*, 575 F.Supp. 1225 (E.D.Pa.1983) (finding it an implicit teaching of *Scott* that section 1985(3) does not reach conspiracies motivated by animus against a political group). But even if the statute does extend somewhat beyond strictly racial classes, it clearly does not apply where there is no discrete, insular class defined by invidious criteria, but only an amorphous, ill-defined group of people who share no common characteristics save a penchant for parking their cars where they may get towed away.

**22**

*See, e.g., Creative Environments, Inc. v. Estabrook,* 680 F.2d 822 (1st Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982); *Shortbull v. Looking Elk,* 677 F.2d 645 (8th Cir.), *cert. denied,* 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 168 (1982). There is no doubt whatever, especially after *Scott,* that section 1985(3) does not reach conspiracies motivated by animus against people who park in certain parking lots. In light of recent cases, and for that matter even under the older cases, this is a frivolous and indefensible position. Indeed, the plaintiff's complaint may fairly be interpreted as claiming that the defendants engaged in a conspiracy motivated by bias towards others on account of their economic views, status, or activities. If this is so, it flies directly in the face of *Scott,* which explicitly held that conspiracies motivated by economic or commercial animus are beyond the reach of section 1985(3). This is not truly surprising, however, since the plaintiff's submissions make it plain that his lawyers remain oblivious of the *Scott* case even though it was decided eight months ago and they could have discovered it with ease had they simply Shepardized the Court's 1971 decision in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338, which they do know about. The same analysis forecloses any possible claim under the second part of section 1985(2) that may be lurking in the plaintiff's nebulous conspiracy allegations. *See, e.g., Mines v. Kahle,* 557 F.Supp. 1030, 1036 (W.D.Pa.1983); *Martinez, supra,* at 324. *Cf. Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). Accordingly, all of the section 1985 conspiracy claims against all defendants are dismissed.

And since there can be no claim under section 1986 absent a valid claim under section 1985, the section 1986 claims are also dismissed. *See, e.g., Williams v. St. Joseph Hospital,* 629 F.2d 448, 452 (7th Cir.1980); *DeBoer v. Martin,* 537 F.Supp. 1159, 1162 (N.D.Ill.1982); *Martinez, supra,* at 328.

■. There being no valid federal claims, all of the plaintiff's state law claims are dismissed for lack of pendent jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Mandarino v. Pollard,* 718 F.2d 845, 850 (7th Cir.1983). *See also Laird v. Board of Trustees,* 721 F.2d 529, 534–35 (5th Cir.1983).

■ With even the modest research that is now required under rule 11, any lawyer admitted to practice before this court quickly should have determined that this relatively minor incident did not amount to a federal case of constitutional dimension. At any rate, what would not have been done after proper research was what occurred here: the filing of a ponderous, extravagant, and overblown complaint that was largely devoid of a colorable legal basis. This was a clear-cut violation of rule 11. In such cases under the new rule, the court has a duty to impose an "appropriate" sanction on the offending attorney. The imposition of such a sanction no longer requires a finding of subjective bad faith, *see Badillo v. Central Steel & Wire Co.,* 717 F.2d 1160, 1166–67 (7th Cir.1983) (decided under former rule 11), or a willful violation of the rule, *see* Fed.R.Civ. P. 11 advisory committee notes, *supra,* ("The reference in the former text to wilfulness as a prerequisite to disciplinary action has been deleted."). And the court may act without inquiring into the lawyer's state of mind, particularly where, as here, the court can determine from the face of the pleading itself that it was not based on a plausible view of the law.

■ In this case, the court concludes that it is an appropriate sanction to require the plaintiff's lawyers to pay one third of the fees and costs incurred by the defendants in connection with their motions to dismiss the amended complaint. The defendants shall submit documentation of such fees and costs within 10 days from the date this order is docketed.

## ON MOTION FOR RECONSIDERATION

The plaintiff has filed a motion for reconsideration under rule 59(e) together with a supporting memorandum and affidavits. This motion has two parts.

First, the plaintiff argues that I should not have dismissed his amended complaint. He says I misinterpreted some of the allegations in the amended complaint, principally his admission that three days elapsed between the detective's telephone call and the plaintiff's appearance at the police station. Although it was not stated anywhere in the amended complaint, the plaintiff now explains that he waited three days to go to the police station because that was when he had arranged an appointment to meet the detective. This fact, even had it appeared in the amended complaint—which, like most of the other "facts" the plaintiff now purports to rely on, it did not, *see Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, at 146 (7th Cir.1984) ("We will dispense with plaintiff's briefs and instead rely upon the complaint for the facts."); *Dillard v. Rumph*, 584 F.Supp. 1266, 1267–68 (N.D.Ga.1984) (arguments in plaintiff's brief "are not the appropriate means to raise claims that are nowhere clearly set forth in the complaint")—does not convert a mere telephone call into a "seizure" under the fourth amendment. And to continue to suggest otherwise in the face of the authorities to the contrary which I cited in my prior opinion is to engage in an obdurate refusal to face reality. This mind-set, this stubborn persistence in trying to distort or ignore controlling authority in an effort to cobble together some kind of section 1983 claim at any cost is the very reason I felt this was an appropriate case to apply the sanctions provision of the amended version of rule 11.

Under the few sketchy facts that do appear in the amended complaint it is clear that the soonest any fourth amendment claim possibly could have arisen was at some point after the plaintiff's arrival at the station house. But as I stated in my earlier opinion, there are no *facts* alleged which support a fourth amendment claim.

To be sure, the plaintiff ultimately was arrested, and the fact of the arrest is alleged. But it does no good simply to say you were arrested and then tack on a conclusory assertion that the arrest was unconstitutional. Notice pleading does not permit you to plead a civil rights case merely by stating the bald legal conclusion that the defendant violated your rights under one or another of the amendments. The authorities, including those that control in this circuit, say just the opposite. *See, e.g., Winterland Concessions Co. v. Trela*, 735 F.2d 257, 262 (7th Cir.1984); *Jafree v. Barber*, 689 F.2d 640, 643 (7th Cir.1982); *Cohen v. Illinois Institute of Technology*, 581 F.2d 658, 663 (7th Cir.1978), *cert. denied*, 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979); *Maloney v. Washington*, 584 F.Supp. 1263, 1265, 1266 (N.D.Ill.1984) (conclusory allegations in a civil rights case "cannot support a well-pleaded claim for relief"; "specific facts" are required); *Antonelli v. Burnham*, 582 F.Supp. 1067, 1071 (N.D.Ill.1984) ("It is not part of this Court's responsibility [in assessing a § 1983 complaint] to intuit claims from loosely-knit narratives."); *Crumpacker v. Civiletti*, 90 F.R.D. 326, 330 (N.D.Ind.1981) (criticizing the plaintiffs' "buckshot method of pleading" in a civil rights case as placing an " 'undue burden on the court and [opposing] counsel to determine how plaintiff is here and why.' "); *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir.1984) ("Even under the so-called notice rules of pleading, the complaint must state a cause of action sufficient to affirmatively show the plaintiff is entitled to relief .... In civil rights and conspiracy actions, courts have recognized that more than mere conclusory notice pleading is required. In civil rights actions, it has been held that a complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory."); *Sell v. Barner*, 586 F.Supp. 319, 321 (E.D.Pa.1984) ("It is axiomatic that a civil rights complaint must be pleaded with specificity sufficient to provide fair notice to defendants of the substance of plaintiff's claims and the grounds upon which

**24**

they rest.... Where a complaint 'relies on vague and conclusory allegations [it] does not provide "fair notice" and will not survive a motion to dismiss.' ... Neither the defendants nor the Court can be required to piece together in jigsaw fashion the factual allegations with which plaintiff intends to support his claims."); *Armstead v. Town of Harrison,* 579 F.Supp. 777, 781 n. 23 (S.D.N.Y.1984) (*"Conley v. Gibson* [355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80] ... does not relieve plaintiff of alleging the essential elements of a claim under § 1983, and the District Court is not obliged to rewrite a faulty complaint in order to save it from a motion to dismiss."); *Howard v. Koch,* 575 F.Supp. 1299, 1303–04 (E.D.N.Y.1982) ("[T]o prevent the proliferation of vague and wholesale allegations, encouraging the redress of imagined wrongs, the Second Circuit has long endorsed a requirement of specificity in entertaining [§ 1983] complaints.").

The plaintiff failed to allege a single fact from which it could be inferred that he did not commit the vandalism as charged by the two private citizen complainants and that the police officers at the station somehow should have known this but arrested him anyway. The fact that the plaintiff denied throwing the paint and that he eventually was found not guilty does not mean that the police had no basis for believing the complaining witnesses. It is not reasonable to infer that two businessmen ordinarily would show up at a police station and subject themselves to criminal liability under Illinois law by making a false police report accusing someone of a crime they knew he did not commit. There is nothing in the complaint which suggests that the police should have drawn this unreasonable inference and disbelieved the witnesses when they reported the vandalism and identified the plaintiff as the culprit. The plaintiff himself says in his brief in opposition to the city's motion to dismiss that after he voluntarily "presented himself" at the police station he was "identified ... as the person who had thrown paint on the building occupied by the defendant, Lincoln Towing Service," and that "as a result of

this identification" and the private citizens' insistence that the detective "write up the Complaint," he was arrested. Far from suggesting that the police had no reasonable basis for making the arrest, these judicial admissions lead to just the opposite conclusion. *See, e.g., Gilmere v. City of Atlanta,* 737 F.2d 894, 905 (11th Cir.1984) (officers had probable cause for arrest when crime victim observed suspect and said, " 'That's him, he's the one.' "); *Mundy v. State of Georgia,* 586 F.2d 507, 508 (5th Cir.1978) (witnesses' identification of suspect from photographic array provided officer with "ample probable cause to swear out a warrant for his arrest"); *Barnes v. Dorsey,* 354 F.Supp. 179, 183 (E.D.Mo.), *aff'd,* 480 F.2d 1057 (8th Cir. 1973) ("From the allegations of the complaint itself it appears that the report of [the victim] gave the arresting police ample probable cause to arrest [the suspect]."). Furthermore, under the circumstances narrated in the amended complaint, the police did have a reasonable basis for concluding that the plaintiff had a motive to seek revenge against the towing company by committing the alleged vandalism. He was a disgruntled individual whose car had been towed away and who had been compelled to pay a towing fee to get it back. In contrast, as has already been mentioned, there is nothing whatever in the amended complaint from which it could be inferred that the police had a reasonable basis for thinking that the towing company's employees had any motive to make up false charges against the plaintiff. By the plaintiff's own admission, the towing fee had already been paid. Thus the police obviously had no reason to suspect that false criminal accusations were being made in an effort to collect a civil debt.

The next point the plaintiff makes in arguing that dismissal was not warranted concerns my discussion of a due process claim under the fourteenth amendment. In attempting to parse the dense and convoluted language of the plaintiff's amended complaint, which consisted almost entirely of "vacuous legal boilerplate," *EEOC v.*

*Shell Oil Co.,* —— U.S. ——, 104 S.Ct. 1621, 1641, 80 L.Ed.2d 41 (1984) (O'Connor, J., concurring in part and dissenting in part), I deduced that he might have been trying to assert such a claim, independent of any fourth amendment claim, based on his detention in the lockup at the police station for a time following his arrest. It was by no means certain that the plaintiff had any intention of making such a claim, but I analyzed the amended complaint to see if his allegations would support one, and as I finally concluded, they did not. This may have been an unnecessary exercise. The plaintiff seemingly has now disavowed any separate due process claim, saying in his motion to reconsider that he invoked the fourteenth amendment only because that is the conduit through which the substantive guarantees of the Bill of Rights are made applicable to the states. But then, consistent with his thoroughly confused approach to this litigation, the plaintiff reverses his field again and proceeds to talk about a claim for deprivation of liberty under the due process clause of the fourteenth amendment, arguing that the doctrine enunciated in the *Parratt* decision is inapplicable in cases where there has been a deprivation of liberty rather than property. The Seventh Circuit said in the *State Bank of St. Charles* case, which I cited in my prior opinion, that there is nothing that indicates *Parratt* is so limited. And the plaintiff's citation of *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), does not help him because *Logan* is distinguishable. *See Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3203–04, 82 L.Ed.2d 393 (1984) (*Parratt* extends to intentional conduct that is random and unauthorized; *Logan* has "no relevance" in such a case); *Altman v. Hurst,* 734 F.2d 1240, at 1242 & n. 6 (7th Cir.1984). *See also Guenther v. Holmgreen,* 738 F.2d 879 (7th Cir.1984), *aff'g* 573 F.Supp. 599 (W.D.Wis.1983); *Gilmere, supra,* at 905–10. In any event, the *Parratt* analysis on which the plaintiff has now focused was only an alternative basis for concluding that no separate due process claim had been buried somewhere in the tangled rhetoric of the amended complaint. The fundamental ground for rejecting the notion that such a claim had been pleaded was the same as that which precluded the finding of a fourth amendment claim or, for that matter, a claim under any other amendment: there were no factual allegations to support such a claim. It is telling that the plaintiff does not contest—indeed he completely ignores—*this* ground for decision.

Finally in this connection, and rather remarkably in view of the abundance of contrary authority, the plaintiff persists in arguing that he stated a valid conspiracy claim under section 1985(3). He makes this argument even in light of the *Scott* decision, which I discussed in my prior opinion. This assertion is based on an inaccurate reading of *Scott* or a refusal to believe that the Supreme Court really meant what it said in the case. There is simply no reason to think after that case that a plaintiff may bring a claim under section 1985(3) based on a towing company's economic animus against people who patronize certain parking lots. Indeed, as the plaintiff would have learned had he done even a modicum of proper research before filing his amended complaint, there has been no good reason to think such a claim woul . succeed in this circuit since at least 1976, when the Seventh Circuit decided in *Askew v. Bloemker,* 548 F.2d 673 (7th Cir.1976), that a claim under section 1985(3) could not be based on an allegation of animus towards a "class" of persons whose only common characteristic was their status as victims of the defendant's wrongdoing. *See Grimes v. Smith,* 585 F.Supp. 1084, 1089 (N.D.Ind. 1984) (Posner, Circuit Judge, sitting by designation) ("[F]ar from having ever taken an expansive view of section 1985(3), the Seventh Circuit ... was a pioneer in the process of contraction that has culminated in the Supreme Court's decision in *Scott.*"). *See also Miller v. Indiana Hospital,* 562 F.Supp. 1259, 1283 (W.D.Pa.1983) (no § 1985(3) claim where alleged class animus "is not based upon 'immutable characteris-

tics' for which the members of the class have no responsibility").

Notably, for purposes of the question of sanctions, the plaintiff has made absolutely no effort to argue in support of, or attempt to justify the pleading of, the numerous other federal claims that were dismissed. As for the plaintiff's objection that defendant Pagano did not individually move to dismiss the complaint as to him, I find this objection to be without merit. The other defendants' motions to dismiss clearly called the entire complaint into question. The plaintiff must have thought so too; he filed a memorandum in which he purported to oppose the motions to dismiss of "Detective[s] Pagano and McGarry."

 I will not reconsider my decision to dismiss the amended complaint. Nor will I grant the plaintiff's request for carte blanche to draw up yet another complaint. He has already filed one amended complaint as a matter of right. That document demonstrated the plaintiff's failure to comprehend basic principles of constitutional law and his inability to frame a complaint consisting of anything more substantial than a "bouillabaisse" of legal conclusions. *U.S. General, Inc. v. City of Joliet*, 598 F.2d 1050, 1051 (7th Cir.1979). He has not intimated how he intends to cure those deficiencies; nor has he offered a proposed amended complaint. In fact, the instant motion and memorandum strongly suggest that many if not all of the same defective claims would be resurrected were we to launch still another round of pleading. I do not think it would be an appropriate exercise of discretion to permit this, and I do not think the authorities in this circuit mandate it, particularly where the plaintiff is represented by counsel. *See, e.g., Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1243–44 (7th Cir.1983); *Jafree, supra*, at 644–45. A plaintiff who has three lawyers working for him is not entitled to the same solicitude as one who is pro se, and in the former situation there are stricter limits on allowing a plaintiff to file complaint after complaint until he finally hits on something that will withstand a motion to dismiss.

*See, e.g., Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980) (pleadings filed by pro se prisoner litigants held to " 'less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972)); *U.S. General, supra*, at 1053; *Hernas v. City of Hickory Hills*, 517 F.Supp. 592, 593 (N.D. Ill.1981); *Crumpacker, supra*, at 330 & n. 7; *Sell, supra*, at 321; *Palmer v. Coons*, 581 F.Supp. 1160, 1162 (D.Va.1984).

The second prong of the plaintiff's motion for reconsideration concerns the sanction imposed under the amended version of rule 11. The plaintiff's lawyers say such a sanction is not appropriate because they did extensive research before filing the amended complaint and thought they had adequate legal grounds for the multitude of claims they made. They also point to the statement in the advisory committee's notes which says the rule is not intended to chill an attorney's enthusiasm or creativity. These arguments lack merit. In deciding to award a sanction in the amount of only one third of the defendants' fees and costs rather than the full amount, which I believe could have been justified here, I allowed for the possibility that the plaintiff's lawyers may have felt there was some viable legal argument to support ce cain of the claims they made. Based on my analysis of the complaint I was, if anything, quite lenient toward the plaintiff in this regard. For even if it were accepted that some of his claims could be justified under an argument that existing law should be extended, there are more than enough claims that could never be so justified to support the sanction I levied. Even under the most liberal view this complaint was heavily freighted with claims that had no plausible legal basis. The plaintiff has implicitly conceded this by his total failure to present in the instant motion any grounds whatever for reconsideration of the majority of his claims. *Cf. Booker v. City of Atlanta*, 586 F.Supp. 340 (N.D.Ga.1984) (sanction imposed under rule 11 when party made no effort to justify assertion of a position that

was "unmistakably foreclosed" by existing law).

If the new rule is to mean anything, it must mean that this "shotgun approach" to pleading, *Whiten v. Ryder Truck Lines, Inc.*, 520 F.Supp. 1174, 1176 (M.D.La.1981), where the pleader heedlessly throws a little bit of everything into his complaint in the hope that something will stick, is to be discouraged. And I do not believe that such pleading, which is completely meritless on its face as a matter of law, can be left unsanctioned under the general rubric of giving lawyers room to be creative. That would gut the new rule and make it as manifestly ineffective as the former version of rule 11. The plaintiff's argument is tantamount to saying that lawyers must be free to plead now and think about the legal validity of their pleadings later, if ever. *See Larson v. Wind*, 548 F.Supp. 479, 480 (N.D.Ill.1982) (criticizing "counsel's approach of 'plead now and analyze later' "). That, however, is the very practice the new rule is intended to halt. *See Huettig & Schromm v. Landscape Contractors Council*, 582 F.Supp. 1519, 1522 (N.D.Cal. 1984) ("Rule 11 [as amended] is a response to a widely felt need to end abuse of the litigation process such as occurred here. If the Court were to tolerate this kind of conduct, the capacity of the judicial system to serve the ends of justice would soon become impaired."). And since the standard is one of reasonableness—an objective standard—it is not relevant that an individual lawyer might think, on the basis of his own idiosyncratic view of the law, that it is acceptable for him to assert a claim that no rational pleader would put forward. The plaintiff's lawyers, for example, still think they have a good argument to support a section 1985(3) claim based on economic or commercial animus after the *Scott* decision. But no matter how firmly they believe this, and no matter what their rationale, it is not a reasonable view under any objective standard because the Supreme Court unequivocally said just the opposite in *Scott*. *See Wells v. Oppenheimer & Co., Inc.*, 101 F.R.D. 358, 359 & n. 3 (after stating that "the Rule might as well be repealed" if the

standard were held to be one of subjective bad faith, the court explained that this was so because "there is no position—no matter how absurd—of which an advocate cannot convince himself"). *See also Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, at 230–231 (7th Cir.1984) (Pell, J., concurring) ("No judge ... can be unaware of the growth of litigation not only in volume of cases per se but in cases of questionable merit. Our society has truly been termed a litigious one. Lawyers should be chilled from bringing cases to court which objectively any competent lawyer should know were meritless."); Address by Chief Justice Warren Burger, American Law Institute Annual Meeting (May 15, 1984), *quoted in* 52 U.S.L.W. 2658 (May 29, 1984) ("When the elder statesmen among you here today came to the bar, I am sure you were told, as I was, that your signature on a pleading or motion was something like your signature on a check. There was supposed to be something to back it up .... That tradition has become tattered .... This is another area where a few well placed sanctions will have a salutory effect."); Address by Senator Howell T. Heflin, member of the Senate Judiciary Committee, 44th Annual Judicial Conference of the District of Columbia Circuit (May 13, 1983), *quoted in* 100 F.R.D. 111, 205 (1983) (The amended version of rule 11 "provides that the attorney's belief in the validity of the filing must have been formed after reasonable inquiry, and cannot simply represent loyalty to the client or wishful thinking.").

 As for the suggestion that I must give the plaintiff's lawyers a hearing before imposing a sanction under rule 11, I do not agree that a hearing is required under the circumstances of this case. A hearing would serve no meaningful purpose since I imposed the sanction based on my conclusion that a majority of the claims made in the amended complaint were unreasonable as a matter of law. It would be of no value to hold a hearing at which the plaintiff's attorneys could explain to me why they felt it necessary to festoon their com-

plaint with frivolous claims based on the first and seventh amendments, for instance. There is no possible justification under an objective standard for loading down a complaint with worthless claims such as these, which are totally unsupported by even a single allegation in the complaint. The advisory committee's notes clearly contemplate that in some instances a district court will know enough about a particular pleading, without conducting a hearing, to decide that it violates rule 11. This may not be true in all cases of course, but it is true here. Due process does not demand a hearing to develop facts where the ruling is one of law and the facts adduced at the hearing would not alter the legal conclusion. The advisory committee's notes expressly caution against getting bogged down in "satellite litigation" in administering the new rule. The decision in *Textor v. Board of Regents*, 711 F.2d 1387 (7th Cir.1983), which the plaintiff's lawyers have cited in support of their assertion that they must be given a hearing, is not on point. In that case the assessment of a sanction rested on a finding that the lawyers had acted in bad faith. Here, the lawyers' subjective intent is not material to the decision to impose a sanction.

One facet of the motion to reconsider does have merit. Rule 11 is aimed at lawyers who put their name on a pleading without first making a proper inquiry into the relevant law and facts. One of the plaintiff's three lawyers filed an appearance but did not attach her name to the defective pleading. Thus she did not technically breach the rule's signing requirement, and my order will be modified to relieve her from the obligation of paying the sanction.

All that remains is to set the amount of the sanction. After reviewing Mr. Knudson's submission, I find the amount of $474.70, representing one third of the fees and costs incurred by his clients, is reasonable. With respect to Mr. Sheridan's submission, I find that 14 hours is a reasonable amount of time, and I conclude that the appropriate rate is the same as that charged by Mr. Knudson. I will exclude the overtime pay received by the police officers for going to the corporation counsel's office for conferences. One third of the remaining fees and costs is $383.73. Thus, the total sanction is $858.43.