THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY RICHARD MILLER, Defendant-Appellant.

Third District    No. 80-81

Opinion filed October 21, 1980.—Modified on denial of rehearing November 26, 1980.

Robert Agostinelli and Karen Szpajer, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal by the defendant, Jerry Richard Miller, from his conviction for murder and armed robbery by the Circuit Court of Peoria County following a jury trial. He was sentenced to concurrent terms of 40 years' imprisonment for murder and 25 years for armed robbery.

On August 30, 1979, the body of Paul Brown, the night watchman, was discovered at the Willow Knolls Country Club. He had been stabbed

and shot to death. A small safe had been taken from the clubhouse office. The Peoria County sheriff's investigation was unsuccessful until September 6, 1979, when sheriff's detectives Schofield and Sylvester went to Debra Rogers' apartment located on Willow Knolls Road near the country club. Rogers had earlier told a city patrolman that she and her boyfriend, the defendant, had been standing on the balcony of their apartment during the early morning hours of August 30, and had heard what sounded like gunshots and shortly afterward saw a small white car accelerating at a high rate of speed on Willow Knolls Road.

When Schofield and Sylvester went to Rogers' apartment they knew that a white Corvette which had earlier been reported stolen had been found on August 30 and that the safe taken from the clubhouse had been small enough to fit inside the Corvette. They also knew that a shoeprint had been found on some broken glass near Brown's body, and they had a description of the type of shoe that would make such a print.

Rogers was not at home when Schofield and Sylvester arrived, but her younger brother admitted them to the apartment. While waiting for Rogers, the detectives went out onto the balcony and concluded that it would be difficult to see vehicles passing on Willow Knolls Road because of all the obstructions. After waiting for awhile they decided to leave. They met Rogers and the defendant in the parking lot and asked Rogers if they could interview her about her statement to the patrolman. At first Rogers refused but later agreed to talk to the detectives.

All four returned to the apartment and the interview began at 7:20 p.m. in the living room of the apartment. Sylvester questioned Rogers and the defendant about her statement to the patrolman. When questioned about the obstructed view, Rogers said she only had a glimpse of the car. During the questioning of Rogers the defendant put his feet onto the coffee table so that the soles of his shoes were visible. Sylvester told the defendant that the pattern on the soles of his shoes matched the shoeprint on a glass fragment found at the country club. Sylvester then asked defendant if he had been employed on August 30 and whether he had worked that day and the defendant replied that he had. Sylvester asked the defendant to telephone his employer and verify the hours he worked on August 30. The manager told Sylvester that the defendant normally started work at 7:30 a.m., but on August 30 he came in at 1:15 p.m. and appeared tired. The manager also told Sylvester that the defendant had asked a co-worker if he could use the co-worker's car to commit a robbery.

Sylvester told the defendant the substance of the conversation and then asked the defendant if he owned a knife. Defendant said he had one, but after a cursory search said he could not find it. Schofield reminded Sylvester about a police report that two youths had attempted to buy a

used car shortly after midnight on August 30 and one of the youths, whose description matched that of the defendant, dropped a knife while talking to the owner. The youth picked up the knife and hid it behind his back. Schofield then told the defendant that the detectives considered him a suspect in the Brown homicide. After the defendant was told his *Miranda* warnings, he was told that the detectives would like him to accompany them to the detective offices at the Peoria County jail to give a written statement. The defendant then privately told Schofield that he had some marijuana and Schofield agreed not to arrest him for possession. During this conversation the telephone rang and the defendant spoke to someone named Todd. The telephone rang again and Rogers spoke to Todd. A third telephone call was from Rogers' mother, and Rogers, Sylvester, and the defendant talked to her. As they were preparing to leave a uniformed city patrolman appeared at the door. Both Sylvester and Schofield denied requesting his presence.

Schofield, Sylvester, and the defendant then drove to the detective offices in Schofield's unmarked car, leaving Rogers' apartment at 7:50 p.m. Schofield drove while Sylvester and the defendant rode in the back. Defendant was not handcuffed or told he was under arrest and neither officer displayed his firearm to the defendant.

As they were driving, Sylvester saw that the defendant was crying and at this time asked the defendant if he knew anything about the Brown homicide. Defendant would not say anything at first, but in response to further questioning said that he had not hurt or killed anyone, but that Todd Reese had killed Brown, and Debra Rogers had been in the car with them. Schofield, Sylvester, and the defendant arrived at the detective office at 8:05 p.m. Defendant gave an oral statement, signed a two-page statement written by Sylvester and also signed a six-page typewritten statement, all of which were completed by 10 p.m. Defendant then led police to a ravine where items, including the safe, taken from the country club were found.

On September 25, 1979, defendant was charged with murder and felony murder. On October 23, 1979, he was charged with armed robbery. He entered a plea of not guilty to all charges and defendant also filed a motion to suppress all statements and evidence resulting from or discovered as a result of his statements. In the motion defendant alleged that the statements were the result of an illegal arrest, in violation of his *Miranda* rights, and a product of psychological coercion.

At the hearing on this motion the defendant testified that after he was given the *Miranda* warning he was told by Schofield, "We are going to have to take you down to the station." Defendant testified that he believed he was under arrest based on the actions of the police. He said that Schofield told him the marijuana would be used if the police needed a

charge on which to hold him in custody. The trial court took the motion under advisement and denied it on November 19, 1979. In its written order the trial court stated that the *Miranda* warnings were given fully and properly. The court found that, "* * * Defendant was asked to accompany the Officers to the Police Station and agreed to do so." The trial court also found that there was no psychological coercion, no custodial interrogation prior to the giving of the *Miranda* warnings, no illegal arrest, no statements taken from defendant in violation of his constitutional rights, and no evidence obtained contrary to the fourth amendment.

Defendant's trial began on November 26, 1979, during which his oral and written statements were entered into evidence. There was testimony that a knife and sheath were found in defendant's apartment and it was shown that the shoeprint on the glass found at the country club matched defendant's right shoe. Evidence further established that glass particles found in defendant's shoes matched glass fragments taken from the country club.

Rogers testified that she, the defendant, and Reese were riding in a stolen white Corvette on August 30 and that they drove to the country club, intending to steal. Defendant and Reese were armed, Rogers waited in the car while defendant and Reese went into the clubhouse. Rogers testified that she heard shots and saw the two come back to the car carrying a small safe. She further testified that both the defendant and Reese claimed to have shot and stabbed Brown.

The defendant testified in his own behalf and admitted participating in the robbery, but denied shooting or stabbing Brown, but claimed that he had been killed by Reese.

On appeal the defendant argues that the trial court erred in denying his motion to suppress and that the trial court's judgment of conviction on one count of murder and on armed robbery should be vacated. The State objects to our consideration of the motion to suppress, arguing that the matter was not sufficiently raised in the trial court.

As a general rule an appellant may not raise an issue for the first time on appeal. (*People v. McAdrian* (1972), 52 Ill. 2d 250, 287 N.E.2d 688.) The trial court is the proper forum for the trial of all issues and should have the first opportunity to consider and rule upon each issue. (*People v. Mayberry* (1976), 63 Ill. 2d 1, 345 N.E.2d 97.) In the instant case defendant concedes that he did not specifically articulate in the trial court that his detention for custodial interrogation was prohibited by *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. However, he insists that he did argue generally that he was in custody prior to the time of his formal arrest. We have examined the record and found that defendant in his motion sought to suppress his statements and evidence resulting therefrom because the statements were the result of an

illegal arrest, involuntary, and a product of psychological coercion. In the light of such allegation we prefer to conclude that the defendant did sufficiently raise the issue of custodial interrogation in the trial court, and hence we will consider the issue as to whether the trial court erred in denying defendant's motion to suppress.

Defendant first argues that he had been seized, in the fourth amendment sense, for custodial questioning prior to making his incriminatory statements to the police. Defendant relies on *Dunaway v. New York* and insists that he also was taken involuntarily to the detective offices for questioning. In *Dunaway* the United States Supreme Court ruled that custodial interrogation, without probable cause to arrest, violates the fourth amendment and requires suppression of all statements made during the interrogation and all evidence obtained as a result of those statements unless there is some intervening event between the detention and the statement which sufficiently attenuates their connection so that the taint of the illegal detention is purged.

Defendant Dunaway was involuntarily taken into custody by Rochester, New York, detectives, who had been ordered to "pick [him] up" and "bring him in" for questioning. That order resulted from information which implicated Dunaway in the murder of a pizza parlor owner but which was insufficient to establish probable cause for arrest. Dunaway was not told he was under arrest, but he would have been restrained if he attempted to leave. He was driven to police headquarters in a police car, placed in an interrogation room and questioned. Dunaway then made statements which were eventually suppressed.

*Dunaway* requires a twofold test: first, the statements given must be voluntary, and second, the statements must not have been given as the direct result of an illegal detention. On appeal there has been no renewed challenge to the voluntariness of the statement itself. Therefore, we shall concern ourselves only with the circumstances of the interrogation.

■■ It must first be clearly understood that police officers may question citizens during criminal investigations. Citizens have a duty to cooperate with the police in these investigations. This questioning is not an intrusion on a citizen's fourth amendment rights unless the police take him into custody when they do not have probable cause for an arrest. Then any statement taken from him may be suppressed. *United States v. Mendenhall* (1980), ___ U.S. ___, 64 L. Ed. 2d 497, 100 S. Ct. 1870.

Defendant argues that in taking him to the detective offices for further interrogation, the detectives seized him in violation of his fourth amendment rights. With this we cannot agree, because it is immaterial where the police question a citizen; what matters is whether they have restrained his freedom. If a citizen is restrained the police must have the same probable cause for the restraint as they must have for an arrest.

(*Dunaway v. New York.*) If a citizen is not restrained, no probable cause beyond a belief that he may assist in an investigation is required.

■■ Both defendant and the State agree that he was not physically restrained. The only question then is whether, considering all the circumstances, a reasonable man, innocent of any crime, would have considered himself under arrest and not whether defendant, with his subjective knowledge and fears, would have considered himself under arrest. (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158; *People v. Wipfler* (1976), 37 Ill. App. 3d 400, 346 N.E.2d 41, *aff'd* (1977), 68 Ill. 2d 158, 368 N.E.2d 870; *United States v. Mendenhall*.) In the instant case, unlike the situation in *Dunaway*, the defendant was asked to accompany the officers to the police station and agreed to do so. In *Dunaway* an order had been given to "pick up" the defendant and "bring him in." The purpose or intent of the police in *Dunaway* was to physically restrain the defendant if the same became necessary. In the instant case the defendant was not immediately whisked away to the police station but after being questioned for one-half hour at the apartment during which time the defendant carried on two phone conversations as did his girlfriend, Debra Rogers. It was after considerable activity in the apartment that the defendant was requested to accompany the officers to the police station, to which he readily assented. When first contacted by the officers the defendant was considered a possible witness or one who could assist the police in their investigation. After questioning the defendant and deciding that his status was no longer that of a mere witness but as a possible suspect, he was so informed and advised as to his *Miranda* rights. In the light of the circumstances we cannot conclude that there was an illegal arrest or seizure of the person of the defendant in violation of his fourth amendment rights.

Defendant has also argued that there was no probable cause for his arrest and that his statements and any evidence discovered as a result of those statements should be suppressed. In view of our determination that there was no seizure of defendant, we find no merit in those arguments. We find no error in the trial court's denial of defendant's motion to suppress.

The second issue raised by defendant is that his conviction on one murder count and on the armed robbery count should be vacated. He argues that the jury's general verdict of guilty of murder is ambiguous and the ambiguity should be resolved in his favor. Defendant had been indicted for murder, felony murder, and armed robbery. The jury was instructed on murder and felony murder but only provided with a general murder verdict and an armed robbery verdict. They returned guilty verdicts for murder and armed robbery. The trial court then entered a judgment of conviction on two counts of murder and one count

of armed robbery, but only sentenced defendant for armed robbery and one count of murder.

■■ When a jury returns a general verdict of guilty, it is presumed that it is based on any good charge to which the proof is applicable. (*People v. Lymore* (1962), 25 Ill. 2d 305, 185 N.E.2d 158; *People v. Brown* (1980), 83 Ill. App. 3d 261, 403 N.E.2d 1324.) If two or more of those charges arise from the same transaction, there cannot be multiple convictions and punishments unless each of those offenses requires proof of a fact which the other does not. (See *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1; *People v. Brown*.) Since defendant was convicted of both murder and felony murder, we must examine both to determine whether each requires proof of a fact which the other does not. Murder requires a killing plus specific intent. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1) and 9—1(a)(2); *People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446.) Felony murder requires proof that defendant was attempting or committing a forcible felony (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3) and that there was a killing as a direct result of the commission of the felony (*People v. Brown* (1979), 70 Ill. App. 3d 922, 388 N.E.2d 1253). One may be convicted of felony murder even though he did not intend to kill anyone and did not personally kill anyone (*People v. Miner* (1977), 46 Ill. App. 3d 273, 360 N.E.2d 1141; *People v. Ray* (1979), 80 Ill. App. 3d 151, 399 N.E.2d 977), because the underlying felony substitutes for the intent to commit the murder. Since each offense requires proof of a fact which the other does not, it is possible that a defendant may be convicted of both murder and felony murder.

Defendant also argues that his conviction and sentence for armed robbery should be vacated because, for purposes of double jeopardy, felony murder and the underlying felony are the "same" offense. This court has recently ruled on that issue in *People v. Gulliford* (1980), 86 Ill. App. 3d 237, 407 N.E.2d 1094. Gulliford was charged with armed robbery and felony murder. The evidence established that his companion struck the victim on the head with a metal pipe and robbed him. We found in *Gulliford* and we find in the instant case that two different and distinct acts were committed, despite the interrelationship of those acts. Therefore, conviction of two separate offenses is possible, and defendant's contention as to double jeopardy is without merit. We find no double jeopardy.

For the reasons stated above, the judgment of the Circuit Court of Peoria County is hereby affirmed.

Affirmed.

ALLOY, P. J., and STENGEL, J., concur.