THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT SKOZEN, Defendant-Appellant.

First District (2nd Division)   No. 84—1494

Opinion filed April 8, 1986.

Edward M. Genson, Maren J. Dougherty, and Thomas A. Corfman, all of Genson & Steinback, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Dean P. Karlos, and Diane M. Dickett, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BILANDIC delivered the opinion of the court:

Defendant Robert Skozen was indicted by a grand jury and charged with two counts of murder and one count of armed robbery. After a bench trial, he was convicted of murder and sentenced to 25 years' imprisonment.

On the night of Friday, January 14, 1983, Detective Chris Grogman was assigned to investigate the discovery of human remains at 1437 West Dickens in Chicago. Grogman discovered an upper torso, cut at the navel, with the arms and head removed. The torso was clothed in a shirt and tie. Grogman noticed a hole in the chest area around the heart, and a medical examination performed later showed that the cause of death was a .38 caliber gunshot wound. Grogman also saw a business card in the shirt pocket. On its face was written: "I.M.A.C. Corporation, Gears, Splines, and Gear Racks, 431 West BlueRidge, Orange, California 92665, Area Code 714/974-8780, George Malloy." On the back, a telephone number was written. A check of the number disclosed that it was assigned to the Atlas Gear Company, which was owned by defendant.

Detective Thomas Sappanos, assigned to Area Six Violent Crimes, joined the investigation. Sappanos learned that a George Malloy had flown in from California on Tuesday, January 11, and had checked into the O'Hare Hilton. A check of the room showed no evidence that Malloy had slept there.

Further investigation revealed that a Reverend James Jackson of Christ Church, Des Plaines, a family friend, had been contacted by Mrs. Malloy's sister on Wednesday, January 12, about Malloy's disappearance. Jackson and a friend had visited the defendant at Atlas Gear on Thursday. Defendant told them that he had not seen Malloy recently but that he had done business with Malloy before. On Friday, Jackson filed a missing person's report, and it was later that day when the torso was found.

Early on Sunday morning, January 16, Sappanos called Malloy's wife in California. She informed him that Malloy had flown to Chicago on Tuesday and did not return on Wednesday as scheduled. He had arranged for defendant to pick him up from the airport. The sole purpose of Malloy's trip was to resolve the balance of money that he allegedly owed for some machinery ordered from defendant. Defendant

and Malloy had been doing business since the previous October, and Malloy had sent defendant a check for $30,000. Malloy had not received his order, and defendant had demanded another $30,000.

Mrs. Malloy also told Sappanos that after her husband failed to call her upon arrival, as was his custom, she and her son tried to call Malloy at his hotel throughout the night. The next morning, she called defendant's factory. She spoke to someone named "Bob," presumably defendant, who told her that he had not seen Malloy and that he did not have an appointment with him. Bob also asked if Malloy had brought a check with him because an additional $30,000 was owed for certain machinery.

Based on this evidence, Sappanos filed a complaint for a search warrant on Sunday morning, January 16, 1983. The complaint sought permission to search the Atlas Gear Company and to seize, among other things, body parts of George Malloy and any property belonging to him, tools used for dismemberment, a .38-caliber firearm, and certain business records of Atlas.

Sappanos and Detective Tom Keane executed the warrant at Atlas Gear at about 8:30 a.m. Inside the building, they saw parallel drag marks on the floor that led to a storage room. There, Sappanos saw a mattress and box spring covered with blood and something that looked like hacking marks on the vinyl floor. Sappanos found a pair of shoes, red oxford loafers, and a .38-caliber shell casing. Blood and human tissue were found in a large industrial washroom. Sappanos called Mrs. Malloy again, and she described the shoes that her husband was wearing when she saw him last. Her description matched the shoes that Sappanos found.

In the meantime, Sergeant Francis O'Connor, who headed the investigation, tried to contact defendant to inform him of the search. When he was unable to do so, O'Connor called defendant's father and brother. At about 10 a.m., O'Connor renewed his attempts to locate defendant and sent two detectives to defendant's residence. The detectives entered the residence through the back door, saw defendant lying on a sofa watching television, and informed him that they wanted him to accompany them to the factory.

The testimony regarding this incident differs. Defendant testified, at the suppression hearing, that the police entered with guns drawn, told him that he was under arrest, handcuffed him, and forcibly took him to his factory. In contrast, Detective Robert Elmore, who was at the scene, testified that he did not place defendant under arrest, did not handcuff or search him, and that defendant accompanied them voluntarily. Elmore and his partner took defendant to Atlas Gear,

where O'Connor asked the defendant to go with him to Area Six Headquarters.

They arrived at about 11 a.m. and proceeded to an interrogation room. Sergeant O'Connor advised defendant of his *Miranda* rights and questioned him for about 45 minutes. According to O'Connor, defendant voluntarily signed a consent to search form at about noon. The consent allowed the police to search his residence without a warrant. Officer Richard Cauble, however, testified that defendant signed the consent form at about 12:15 p.m.

In the meantime, defendant's brother called defense attorney Edward Genson. Genson called an associate, John DeLeon, and told him to see defendant at Area Six Headquarters. DeLeon arrived about noon and asked to see defendant at about 12:07 p.m. O'Connor, who was informed that DeLeon wanted to see defendant, told DeLeon that defendant had not requested an attorney and did not want one. O'Connor informed defendant of DeLeon's presence, but defendant responded, "I don't need a lawyer." DeLeon, however, insisted on seeing defendant, and O'Connor took DeLeon to see the defendant at about 12:35 p.m., some 28 minutes after DeLeon's initial request. Defendant told DeLeon that he did not need a lawyer, a statement that DeLeon denied.

DeLeon spoke with defendant alone for about five minutes and advised him of his rights. DeLeon then asked a police officer if defendant was free to go home. Sergeant O'Connor testified that defendant was free to leave; DeLeon contradicted that.

Defendant was formally arrested some time after 2:30 p.m. At about 3 p.m., the police requested that defendant remove his clothing for examination because it was splattered with blood. DeLeon advised defendant not to cooperate. Defendant, however, disregarded DeLeon's advice, voluntarily removed his clothing, and gave it to the police. The police photographed defendant and informed DeLeon that defendant was to be held overnight.

When DeLeon returned the next morning, he noticed that defendant was bruised. Defendant told him the following: He was handcuffed to a ring on the wall while he was being interrogated. After he refused to sign a statement, the police beat him on his hands, legs, and arms. The police also applied electric cattle prods to his genitals and beat him with blackjacks. The entire ordeal lasted seven or eight hours, and defendant was left handcuffed to the wall until morning.

DeLeon photographed defendant's injuries and asked that defendant be taken to the hospital. Defendant was admitted to Ravenswood Hospital and stayed four or five days. Medical personnel testified by

stipulation that they noticed a large bruise on defendant's back, but there was no evidence to show what caused the bruise or when it began.

On Monday, January 17, 1983, a second search warrant was issued for Atlas Gear Company. The complaint was filed again by Detective Sappanos, who requested permission to seize digging tools, a section of flooring, and Atlas' financial records.

A month later, on February 17, 1983, some body parts were found in rural Michigan. Chief of Police Rick Winans of the Covert Township police department, Van Buren, Michigan, testified that he discovered the remains under some trash that had been dumped on his department's firing range. Winans and another officer discovered the lower half of a torso, a left hand, and a head, along with some machine gears. Among the trash was a Chicago Tribune newspaper with handwriting on it. The handwriting matched that of defendant. Dental records later established Malloy's identity, along with a Masonic ring that had been found on a finger.

Before trial, defendant moved to quash the two search warrants and to suppress the physical evidence taken pursuant to those warrants. Defendant also moved to suppress oral statements and the physical evidence taken from his person.

After a hearing, the court denied the motions. It found that there was sufficient probable cause to support the issuance of the two search warrants. The court also found that the defendant had waived his right to counsel, so the court refused to suppress either the statements or the clothing taken from defendant. The court found that, "Defendant willingly accompanied the police in the first instance, said he didn't need counsel, said he was willing to speak to law enforcement officials. *** Therefore, he certainly waived his right to counsel and his right to insist upon counsel."

After a bench trial, defendant was convicted of murder and sentenced to 25 years' imprisonment. The court found the evidence against defendant to be "strongly circumstantial."

I

■ Defendant alleges that his fifth amendment right to counsel was violated because the police failed to inform him immediately that attorney John DeLeon was at Area Six Headquarters. After the briefs were filed and this case argued, the United States Supreme Court decided *Moran v. Burbine* (1986), 475 U.S. ___, 89 L. Ed. 2d 410, 106 S. Ct. 1135, which we find controlling. In that case, defendant was arrested and read his rights. He signed three separate waivers and never

requested counsel. While in custody, defendant's sister contacted the public defender's office and asked for an attorney to represent her brother. Upon calling the station, the attorney was told that defendant would not be questioned again until the next day. Without informing defendant of this call, the police continued the interrogation and obtained statements that were used at trial.

The Supreme Court held that the failure by the police to inform defendant that an attorney was trying to reach him did not violate his fifth amendment rights. It was clear that he had voluntarily waived his rights and that he had understood his *Miranda* warnings. The conduct of the police did not affect his capacity to waive those rights, for "[e]vents occurring outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." (*Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, ___, 106 S. Ct. 1135, 1141.) Conceding that the additional information might have affected his decision to confess, the court held that the police are not constitutionally required to provide a suspect with "a flow of information to help him calibrate his self interest in deciding whether to speak or stand by his rights." (475 U.S. ___, ___, 89 L. Ed. 2d 410, ___, 106 S. Ct. 1135, 1142.) Thus, the court was "unwilling to expand the *Miranda* rules to require the police to keep the suspect abreast of the status of his legal representation." (475 U.S. ___, ___, 89 L. Ed. 2d 410, ___, 106 S. Ct. 1135, 1144.) However, the ruling does not permit police to prevent a defendant, who asked for a lawyer, from talking to one. 475 U.S. ___, ___, 89 L. Ed. 2d 410, ___, 106 S. Ct. 1135, 1141.

The court also stated:

> "Nor do we believe that the level of the police's culpability in failing to inform respondent of the telephone call had any bearing on the validity of the waiver. *** [W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident." (*Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, ___, 106 S. Ct. 1135, 1142.)

While stating that the justices "share respondent's distaste for the deliberate misleading" of an attorney (475 U.S. ___, ___, 89 L. Ed. 2d 410, ___, 106 S. Ct. 1135, 1143), the court was not willing to extend *Miranda* so as to prohibit the sort of deliberate deception engaged by

the police against defendant. The court concluded that the police "conduct falls short of the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." 475 U.S. ___, ___, 89 L. Ed. 2d 410, ___, 106 S. Ct. 1135, 1148.

In this case, the defendant was given a *Miranda* warning and waived his right to counsel prior to the time that attorney DeLeon arrived at Area Six Headquarters. He insisted he did not want an attorney and did not need one. Shortly thereafter, DeLeon, who allegedly was retained by defendant's father and brother, arrived and requested to see defendant. In spite of defendant's assertions that he did not want nor need an attorney, the police granted DeLeon's request to confer privately with defendant. He complains now because he had to wait 28 minutes. Under the circumstances, this was a reasonable time. A fact corroborating defendant's waiver of the right to counsel is that the conference with DeLeon lasted only five minutes, even though no time limit was suggested. In addition, shortly thereafter, defendant knowingly and voluntarily, in the presence of DeLeon, declined to follow his legal advice when he gave his blood-stained clothing to the police. The trial court correctly found that defendant effectively waived his right to counsel. Particularly when viewed by the standard set by the Supreme Court in *Burbine*, defendant's constitutional challenge must fail.

## II

Defendant's next point is that the two search warrants issued on January 16 and 17, 1983, lacked requisites of specificity and probable cause to make them legal; therefore, any evidence taken as a result of those warrants should have been suppressed.

The first complaint asked for the seizure of the following:

> "body parts of George Malloy, tools used to dismember these parts, any property belonging to George Malloy and the I.M.A.C. Corp. [address], business appointment schedules of the Atlas Gear Company, and a .38 caliber firearm. This to include body tissues, body fluids, and hair fibers belonging to George Malloy."

The complaint supporting the warrant outlined the investigation that Detective Sappanos had conducted up to that point: the finding of the torso and the business card that contained defendant's business telephone number, the missing person's report filed by Reverend Jackson, and his conversations with Mrs. Malloy, which outlined the business relationship between defendant and Malloy.

The second search warrant, issued the next day, asked for:

"any tools used for digging purposes, a section of flooring bearing evidence in regards to a homicide investigation, any additional property belonging to George MALLOY, and the business/financial records of the Atlas Gear Co. [address]. This to include but not limited to any correspondence with the I.M.A.C. Corp. [address]; George MALLOY, President."

The complaint outlined more evidence: the floor at Atlas Gear was covered with blood and showed cutting marks; a shovel was covered with mud similar to that covering the shoes found at the shop; the shoes were the same brand as those worn by Malloy when he left California; and correspondence showed a business relationship between defendant and victim.

In *Illinois v. Gates* (1983), 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332, the United States Supreme Court adopted a "totality of the circumstances" approach in determining whether a magistrate has sufficient probable cause to issue a search warrant. The court said:

"The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for *** conclud[ing]' that probable cause existed."

Defendant argues that a link between a suspect and a particular address is insufficient to establish probable cause for the issuance of a search warrant. Assuming that is true, the police in this case had more than just an address. Mrs. Malloy told Detective Sappanos that her husband had gone to Chicago to see defendant and that defendant was to pick up Malloy at O'Hare Airport. The business card found on the torso contained defendant's business telephone number. The fact that the business was a small factory or machine shop made it possible that a body could have been dismembered there. Also, Mrs. Malloy called defendant the day after Malloy had left California and defendant denied that he had an appointment to see Malloy. Finally, the autopsy showed that Malloy had been killed with a .38-caliber gun and that defendant had several .38's registered in his name. All of this was sufficient to establish probable cause.

Defendant also attacks the warrant's alleged lack of specificity. He argues that the broad description "any property of George Malloy" gave the police license for a "fishing expedition." Given the stage of

the investigation and what the police knew at the time, the police could reasonably infer that the phrase was limited to personal effects. Malloy was on a short business trip and the phrase "any property" could have been reasonably limited to clothing, papers, jewelry, and the like.

A trial court's ruling on a motion to suppress will not be set aside unless the ruling is manifestly erroneous. (*People v. Stewart* (1984), 105 Ill. 2d 22, 41, 473 N.E.2d 840, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.) Taking all the evidence, we find that the court's ruling was not against the manifest weight of the evidence, and defendant's motion to quash the search warrants was properly denied.

## III

■ Defendant argues that his statements to the police should have been suppressed because the police had no probable cause to arrest him. The statements, therefore, were made as the result of an illegal detention. *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

After defendant was taken to Area Six Headquarters, Sergeant O'Connor advised him of his *Miranda* warnings. Later, attorney John DeLeon spoke with defendant and also advised him of his rights. Defendant was then questioned by Detectives Sappanos and Keane. He told them that he was the president of Atlas Gear and that he and his brother were the only ones with the keys. Defendant also stated that he was alone at the factory from noon on Tuesday, January 11, to Thursday morning, January 13. Defendant also admitted that he had a business relationship with Malloy and that Malloy owed him some money for machinery. Defendant said that he had not seen Malloy within the last several weeks. Defendant now claims that these statements should have been suppressed because they were the fruit of an illegal arrest because the police had no probable cause to arrest him.

The trial court properly denied defendant's motion to suppress because there was sufficient probable cause. The standard for determining probable cause to arrest is "whether a reasonable, prudent person in possession of the officer's knowledge would believe that a crime has been committed and that the accused committed the offense." (*People v. Jackson* (1981), 96 Ill. App. 3d 1057, 1060, 422 N.E.2d 195, *appeal denied* (1981), 85 Ill. 2d 570.) As we have seen in summarizing the evidence above, there was sufficient evidence to support probable cause for defendant's arrest.

Defendant's theory rests on the fact that the statements were made during an illegal detention, before the defendant was formally arrested. The record, however, shows that defendant made the state-

ments after he was already arrested. Detective Sappanos testified that defendant made those statements to him and Detective Keane shortly before defendant was asked to give his clothing to the police.

■ Even if we assume that the police had no probable cause to arrest defendant, the statements were properly not suppressed because it is well established that the police may question a citizen during a criminal investigation. (*People v. Miller* (1980), 89 Ill. App. 3d 973, 977, 412 N.E.2d 175, *appeal denied* (1980), 79 Ill. 2d 628, *cert. denied* (1981), 454 U.S. 871, 70 L. Ed. 2d 175, 102 S. Ct. 339.) The questioning is not an intrusion on one's fourth amendment rights unless the police take him into custody when they do not have probable cause for an arrest. 89 Ill. App. 3d 973, 977, 412 N.E.2d 175.

In this case, the evidence supports the court's findings that the police merely wanted to question defendant and that he cooperated with the police and voluntarily accompanied them to police headquarters. The evidence also shows that defendant was free to leave and that he cooperated with the police by giving up his blood-stained clothing over the objections of attorney DeLeon. Moreover, much of the evidence was established independently through other evidence. The trial court, therefore, correctly denied defendant's motion to suppress.

## IV

■ Defendant alleges that his due process rights were violated because he was beaten by the police in their effort to obtain a confession. Defendant testified that he was beaten with blackjacks and shocked with an electric cattle prod. He also relies on the photographs taken by attorney DeLeon the next day, before defendant was admitted into a hospital. The photographs, however, are not part of the record.

The burden of proof is on the State to show, by a preponderance of the evidence, that any statement was given voluntarily. (*Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 627.) In this case, four detectives contradicted defendant's account. Detective Robert Elmore testified that he never struck defendant. Sergeant O'Connor stated that defendant was never handcuffed in his presence and that neither he nor anyone else coerced defendant. Detectives Richard Cauble and Anthony Villardita also testified that they never struck or coerced defendant.

Next, although defendant maintains otherwise, the statements are not inculpatory. Defendant stated that he and Malloy had a business relationship, a relationship that was proven independently by the tes-

timony of Mrs. Malloy and the correspondence seized at Atlas Gear. Defendant also stated that he was the president of the company and was there alone after the morning of January 11. This statement gives rise to many inferences, only one of which is that defendant had the opportunity to murder Malloy. There is nothing in the statements themselves that inculpates defendant with the murder of Malloy.

In addition, the State presented evidence to prove the murder independently of any statement given by defendant. The physical evidence at Atlas Gear and on the torso, the evidence found in Michigan, and the dispute over a large sum of money were all sufficient to convict defendant.

Lastly, although the photographs showed that defendant was bruised and his back discolored, there was no evidence to show that the bruise was the result of any police beating. The medical testimony did not show what caused the bruises or how old they were. Further, there was no explanation as to why defendant remained in the hospital for several days, other than the fact that defense counsel wanted defendant to stay. Furthermore, the court did not find defendant to be a credible witness.

In sum, the State carried its burden of proof to show that the allegedly inculpatory statements obtained from defendant were not coerced. There was no error in the trial court's denial of defendant's motion to suppress.

## V

■ Defendant's final point is that the evidence was insufficient to support his conviction because George Malloy died from a gunshot wound, and there was no evidence to link defendant with the shooting. Defendant argues that the evidence links him with the dismemberment of the body but not with the murder.

At the end of the trial, the court found the evidence against defendant to be "strongly circumstantial." The evidence supports that conclusion. The torso found in Chicago had a business card on it that contained defendant's business telephone number. Mrs. Malloy testified to the business relationship between defendant and her husband and to the fact that defendant was to pick up her husband at the airport. The evidence also showed that the parties had a dispute over $30,000, a large sum of money. The remaining body parts, discovered in Michigan, were found with a Chicago Tribune that had handwriting matching that of defendant. Also discovered were some gears and machine parts that were of the type used in defendant's factory.

Defendant also had several .38-caliber guns registered to him, al-

though ballistics tests were inconclusive. The Atlas Gear Company factory also showed evidence that a body had been dismembered there: the police found body tissue in the washroom, blood on a mattress, and hacking marks on the vinyl floor. They also discovered the victim's shoes, an ax shovel, and a .38-caliber casing.

Generally, a criminal conviction will not be reversed unless the evidence is so improbable that a reasonable doubt about the defendant's guilt is raised. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) Here, the evidence was clearly sufficient for the court to find defendant guilty beyond a reasonable doubt. It is well established that circumstantial evidence is sufficient to convict. *People v. Warmack* (1980), 83 Ill. 2d 112, 126, 413 N.E.2d 1254.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.