THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DENISE BEHM, a/k/a Denise Abudu, Defendant-Appellant.

Fifth District   No. 5—86—0063

Opinion filed April 22, 1987.

Daniel M. Kirwan and Andrew P. Zinner, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John R. Clemons, State's Attorney, of Murphysboro (Kenneth R. Boyle, Stephen E. Norris, and Kim G. Noffke, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

The defendant, Denise Behm, also known as Denise Abudu, was found guilty of forgery following a bench trial in Jackson County. She had written a check to Resort Air on the account of Ann Langlianis in the amount of $396 in exchange for airline tickets. She was sentenced to 24 months of probation and ordered to pay restitution to Resort Air in the amount of $396 and a fine of $25 to the Violent Crime Victims Assistance Fund. She appeals raising two issues: (1) whether the trial court erred by ordering her to pay restitution in that amount to Resort Air "where no evidence was presented to show that Resort Air had suffered a loss resulting from defendant's conduct" and (2) whether the trial court erred by ordering her to pay a fine of $25 to the Violent Crime Victims Assistance Fund because she was not convicted of a violent crime. In a supplemental brief she raises the further issue, which we address first, of whether the trial court erred by denying her motion to suppress her confession because she did not knowingly and intelligently waive her right to have counsel present when she confessed.

At the hearing on her motion to suppress the State called as a witness Randy Corey, a detective with the Carbondale police department, who testified that on December 5 and 6, 1984, he was investigating a series of forgeries or deceptive practices involving a checking account in the name of Ann Langlianis and that on December 5, 1984, he had received a telephone call from Tokunbo Abudu, who, he testified, was "involved partially in the writing of some of these checks" and is the husband of the defendant. The witness said, "Abudu stated that his wife, Denise, wanted to speak to me about all of these checks involved on the Ann Langlianis' account and she said it was their desire to pay all of those that they had been personally involved in and to make an admission about the writing of the checks to get it all behind them so that they didn't have to worry about it any more." The witness stated, "I advised that the earliest that I could see her would be the following day in the evening, which would have been the 6th of December. He wanted to go up to the Randolph County jail at that time and I told him that I would be happy to go up there and make an interview." The defendant was incarcerated in the Randolph County jail because she had been arrested on a Perry County warrant and Perry County had no

facilities for women. At the time in question there was no active warrant for the defendant in the instant case, which was in the investigatory phase. The witness indicated that he had interviewed Mr. Abudu on three prior occasions and had "asked Mr Abudu to assure me that she, in fact, really did want to make a statement because Chester is an hour away and if she did not wish to make a statement then I did not wish to go up there and I told him to make sure if that was the case and then on the 6th if that still was her position that we would go up there." On December 6, 1984, Tokunbo Abudu came to the Carbondale police station. Asked whether on December 6 Mr. Abudu had indicated to him that Thomas Mansfield had been appointed to represent the defendant, the witness answered, "I think on the ride up to Chester he had mentioned and I believe he did say that Mansfield had been appointed in Perry County for the charges in Perry County." Asked, "Did he at any point in time from your initial contact of December 5th through the time that you talked to Denise Behm Abudu indicate to you that Tom Mansfield did not want you to talk to his wife?" the witness responded, "I don't recall him saying anything like that, no." Asked, "During the entire ride was there any conversation alone [sic] these lines as far as Tom Mansfield being appointed and not talking to the wife?" the witness answered, "Well, like I said it was mentioned that Mr. Mansfield had been appointed to represent her in Perry County for those charges in Perry County. I don't recall him every [sic] saying anything about Mr. Mansfield not wanting her to speak to me though." Asked whether, when the two arrived at the Randolph County jail, he had prevented Tokunbo Abudu from visiting with the defendant, he said that he had not, stating further:

> "Well, in fact, I asked the jailer in Randolph County if it was visiting hours and he said that it was not visiting hours. I said would it be possible—Mr. Abudu asked me if he could see his wife and I said it was up to the jailer and I asked the jailer if he could speak to his wife after the interview and he said if it was okay with me that it was okay with him so subsequent to the interview they did visit for a while."

Asked, "So on December 6th there was no indication from Tokunbo Abudu that you were not to have any conversation with his wife?" the witness responded, "Certainly I wouldn't have driven to Chester if I was not to have a conversation with her. That was the entire point of the trip. They wanted me to speak to her Mr. Abudu and his wife."

The witness testified that at the jail he "advised her of her rights under the Miranda ruling and placed a form before her which

she read. I read from another. She stated that she fully understood and signed the form." He said that she signed the form in his presence and "said that she understood each and every one of these rights and she wanted to speak to me about the Ann Lanlianis [*sic*] account." The defendant was informed that she had a right to talk to a lawyer and to have a lawyer present with her while she was being questioned, that if she could not afford to hire a lawyer one would be appointed to represent her before any questioning occurred if she wished, and that she could decide at any time to exercise these rights and not answer any questions or make any statement. The witness stated that prior to questioning the defendant he had made no promises to her, including any promise of leniency, and did not tell her she would not be punished if she confessed. The witness told the defendant he would submit a copy of the entire interview to the State's Attorney for his consideration. The interview was tape-recorded, part of which was played during the hearing as follows:

"Q. Denise are you aware that this interview is being taped?

A. Yes, sir.

Q. Is this interview being taped with your permission and this statement being made voluntarily without any threats or promises made to you?

[A.] Yes.

Q. I'm handing you a piece of paper, which is a statement of Miranda rights. Denise, have you read those statements of Miranda rights and signed that?

A. Yes, sir.

Q. And you are making this statement not wanting counsel present, is that true?

A. Yes."

On cross-examination when the witness was asked, "In the car on the way over Mr. Abudu told you that Mr. Mansfield had said his message for Mrs. Abudu was that she was not to talk to anyone about this matter. Is that correct?" he responded, "I don't recall any statement like that, no." On cross-examination the witness testified that Mr. Abudu "didn't demand to see [the defendant] before the interview or even request to. He wanted to know if he could see her before we left the building and I said if it was all right with the jailer." Asked on cross-examination, "When you were speaking with Denise before the tape recording was on, you told her that it will be easier on you if you go ahead and confess. Isn't that correct?" the witness answered, "I can absolutely say that is not true." Asked, "You also told Denise that I have driven all of this way and I will be

angry if you don't make a statement?" the witness responded in the negative.

The defendant called as a witness Thomas Mansfield, who testified that on December 5, 1984, he had been appointed to represent the defendant in his role as public defender in Perry County. He recalled having spoken with Tokunbo Abudu "shortly after the appointment. I would say either the 6th or the 7th. It was somewhere along in there." Mr. Abudu, he said, "indicated that he was the husband of the person that I had been appointed to represent and asked some questions about what generally would happen and he indicated to me that the Carbondale Police wanted to talk to Denise and that she was in the Randolph County Jail." The witness stated that "[a]t that point it was my understanding that the Carbondale police had not yet talked to her but that they wanted to talk to her. In my statement and I know him as Jerry, Mr. Abudu, my statement to him was under no circumstances should she talk to anyone about any pending cases." The witness testified that he had told Mr. Abudu "to get this message to her. She is not to talk to anyone be it a policeoffice [*sic*], friend or anyone about any pending criminal case or anything if it was a police officer. He told me that he would relay that message to her." On cross-examination he stated that he was unable to visit the defendant personally at the time because of his schedule, that he had given the message to her husband, and that he did not call the defendant or leave a message for her at the Randolph County jail.

The defendant called Tokunbo Abudu as a witness. He indicated that he had spoken to Thomas Mansfield around noon on December 6, 1984, at which time he received from him the message "[t]o tell Denise not to talk to anybody until she talks to him." He stated that thereafter he drove to the jail to see the defendant but was advised that "it was not visiting time so that I could not talk to her and I asked them if I could give them a message and they said that I should call back on the visiting day and it should be between 3:00 and 4:00." Shortly thereafter he tried unsuccessfully to speak with the defendant on the telephone. He proceeded to Carbondale, where he telephoned and then met with Detective Corey "to see if Detective Corey would talk to Denise because Denise had ordered me to go talk to Detective Corey." He said that he told Detective Corey "Denise is in jail and I told him everything that happened and he said well the best thing to do is for Denise to confess everything so that they can consolidate the whole charges to one place instead of going here and there." The witness indicated that on the "second day when I went to where Denise was," which would, however, have

been December 7, 1984, or a day later than that otherwise indicated by the rest of the evidence, he saw Detective Corey and they went to see the defendant in jail. At that time, he said, he told Detective Corey "that Denise might not want to talk to him because of the message to Denise that Mr. Mansfield wanted to talk to her before she talked to anybody and Detective Corey said he was trying to help us and the best solution to all of these problems was for Denise to confess and that is why he has got his cassette recorder and everything." The witness said, "I remember Detective Corey say if Denise talked to Mansfield he would not do the interview because that means Mr. Mansfield already talked to Denise and what Denise is going to tell him so that is not going to make any sense." When the two got to the jail, the witness said, "I told him that it was between visiting hours and I have got about thirty minutes left and can I visit Denise quick and he said, no, not until he talked to Denise and he could not arrange for extra time after the visiting hours. He would not let me talk to Denise."

The defendant testified that she is 26 years old, that on December 5, 1984, she had asked during her appearance in court that counsel be appointed, that Thomas Mansfield had been appointed as her attorney, and that she had met with Detective Corey on December 6, 1984, "[t]o talk to him about the charges that were brought against me. He was the one conducting the investigation and knew about all of these checks and he was the one that perhaps could help me get some kind or make some kind of solution to this. I didn't know where else to turn to and what else to do." She testified that before the tape recorder was turned on he told her that "he would be really mad if he drove all of the way over here and I didn't make a confession to him. He also told me at the time that things would be a lot easier for me if I went ahead and made a confession." The defendant, who is a college graduate, stated when asked whether she understood the rights as read to her:

"I really thought that I did at the time and I really think of my mental condition at the time of being in solitary confinement because I really didn't understand the point about that I could really have Mansfield in the room at the time. I really didn't understand at the time even though I—I really didn't understand at the time that I could demand that he be present. I think because of the pressure Corey was putting on me about the fact that he drove all the way over there and that things would be a lot easier for me that I went ahead and just signed this paper."

On cross-examination she stated that when she had called her husband she had told him that she wanted to talk to Detective Corey, with whom she had spoken earlier concerning another person.

In its order denying the defendant's motion to suppress, the trial court found, *inter alia*:

"3. Shortly before noon on December 6, 1984, Defendant's husband talked to Attorney Mansfield, Perry County Public Defender, and Mr. Mansfield advised Defendant's husband to tell Defendant not to talk to anyone before Mr. Mansfield had an opportunity to talk with Defendant. This is before Defendant's husband met with Officer Corey to travel from Carbondale, Illinois[,] to Chester, Illinois.

4. While en route from Carbondale, Illinois[,] to Chester, Illinois, Defendant's husband advised Officer Corey that Mr. Mansfield had been appointed to represent Defendant in Perry County on the pending case there and advised Officer Corey that Defendant may not wish to talk to Officer Corey until she, Defendant, had talked to Attorney Mansfield.

5. Upon arriving at Randolph County Jail in Chester, Illinois, Defendant's husband was told he could not visit with his wife before Office Corey had talked to her but could see her after Officer Corey had interviewed her."

The trial court found that at the time the defendant gave the statement on December 6, 1984, her sixth amendment right to counsel had not attached with regard to the case in Jackson County, which was at the time of the statement still in the investigative stage, no information being filed in the case or warrant issued until March 26, 1985. The court found further:

"[10]d. Under the totality of the circumstances test, there can be little doubt that Defendant voluntarily and knowingly waived her Fifth Amendment right to remain silent and to have an attorney present during the taking of the statement. She was advised of those rights, signed a written waiver of those rights, knew that an attorney had been appointed, knew that one bank account was involved in all of the checks and within two days of the statement, entered into a negotiated plea on the Amended Information which was based upon that statement in the Perry County prosecution. Defendant is a healthy adult female who is 26 years of age and a college graduate. She had previously talked to the officer and through her husband, had initiated the interrogation with the officer. At no time during the statement did she ever request to talk

to an attorney.

e. Even assuming that Attorney Mansfield was representing her generally, he had made no attempt to contact her personally, she made no request to talk to him and expressed no interest in talking to him before giving the statement to Officer Corey. She was advised of her right to talk to an attorney and signed a written waiver of that right prior to the giving of the statement. Further, she did talk to Attorney Mansfield after the statement and was represented by Attorney Mansfield at the time she entered a plea of guilty in Perry County, Illinois[,] to an Amended Information which in part was based upon that statement.''

On appeal the defendant makes no assertion that her sixth amendment right to counsel had attached with respect to the case in Jackson County when she gave the statement on December 6, 1984. She relies on the cases of *People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325, and *People v. Holland* (1986), 147 Ill. App. 3d 323, 497 N.E.2d 1230, contending that we, like the court in *Holland*, ought to follow *Smith* rather than the more recent case of *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135.

In *Smith* our supreme court held that when police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him. The defendant in *Smith* and an accomplice were arrested shortly before midnight and at 5:30 a.m. met with a private attorney who agreed to represent them. Later that morning a judge advised them of the charges against them, and they were transported to another county jail. At about 3 p.m. that same day, another attorney from the same law firm arrived at the jail to which the defendant had been transported and was told by the jailer that she could not see the defendant because he was going through heroin withdrawal. The attorney wrote on one of her business cards that she was the partner of the attorney who had agreed to represent the defendant and that the defendant should not make a statement without one of his lawyers present. The defendant received the card, was later interrogated, and gave an incriminating statement without his attorney's being notified. The court in *Smith* stated that although the defendant had received the attorney's card, without his being informed that the attorney had also requested to confer with him, the card and message were of little value.

In *Holland* the defendant was arrested at about 8:15 a.m. and taken to the Schiller Park police station, from which he was subsequently transported to the Des Plaines police station. An investigator with the Des Plaines police department testified that he had spoken with the defendant's attorney between noon and 12:15 p.m. and that the attorney had requested that he be notified if the defendant was transported to the Des Plaines police station for a lineup. The detective stated further that he had called the attorney's house between 2:30 and 2:45 p.m. to notify him that a lineup would be held but that the attorney was not at home. At about 3:47 p.m. the attorney arrived at the Des Plaines police station and spoke with the defendant, who had been interviewed by an assistant State's Attorney with the investigator present at about 2 p.m., informed of his rights, had expressed a willingness to talk, and had given an incriminating statement at about 2:30 p.m. The assistant State's Attorney had spoken with defense counsel at about 3 p.m. but at the time of the interview did not know that defense counsel had been attempting to contact the defendant. Defense counsel indicated that he had called the Des Plaines police station at about 1 p.m., had spoken to the investigator, had advised him that he had been retained to represent the defendant, and had asked to speak with the defendant, who, he was told, had not yet arrived at the Des Plaines police station but was still in transit from Schiller Park. The attorney indicated further that he had informed the investigator that he did not want his client interviewed until he had had an opportunity to speak and confer with him. Following *Smith*, the court in *Holland* concluded that the defendant had not waived his right to counsel during the custodial interrogation at the Des Plaines police station because the police had not told him that his attorney was trying to reach him. The court in *Holland* declined to follow *Moran*.

In *Moran*, decided after *Smith*, the Supreme Court of the United States granted *certiorari* to decide whether a prearraignment confession preceded by an otherwise valid waiver must be suppressed either because the police misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him. In *Moran* a defendant arrested for burglary in Cranston, Rhode Island, appeared to have been involved in a murder in Providence, Rhode Island. At about 7 p.m. on the day of his arrest, three police officers from Providence arrived at the Cranston headquarters for the purpose of questioning the defendant about the murder. At about 7:45 p.m. the defendant's sister called the public defender's office to obtain legal

assistance for him. At about 8:15 p.m. an assistant public defender called the Cranston police station to state that the defendant was represented by her colleague and that she would act as his counsel in the event that the police intended to place him in a lineup or to question him. Counsel was advised that the police would not be questioning defendant or putting him in a lineup and that they were through with him for the night. About an hour later a series of interrogations by police began in which the defendant was advised of his Miranda rights, on three separate occasions signed a form acknowledging that he understood his right to the presence of an attorney but explicitly indicating that he did not want an attorney called or appointed for him, and signed three written statements fully admitting to the murder. The defendant was unaware of his sister's attempts to retain counsel and of the fact and contents of the assistant public defendant's telephone conversation. In determining that the three inculpatory statements should not have been excluded, the court stated that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." (475 U.S. 412, 422, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141.) The court observed further that "whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his Miranda rights unless he were at least aware of the incident." 475 U.S. 412, 423, 89 L. Ed. 2d 410, 422, 106 S. Ct. 1135, 1142.

 In the instant case the defendant relies on the court's observation in *Moran* that "[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." (475 U.S. 412, 428, 89 L. Ed. 2d 410, 425, 106 S. Ct. 1135, 1145.) The defendant urges that *Moran* does not overrule *Smith* but, rather, expressly allows Illinois to "mandate tougher standards regarding waiver of counsel." In the instant case the trial court expressly found that "[w]hile en route from Carbondale, Illinois[,] to Chester, Illinois, Defendant's husband advised Officer Corey that Mr. Mansfield had been appointed to represent Defendant in Perry County on the pending case there and advised Officer Corey that Defendant may not wish to talk to Officer Corey until she, Defendant, had talked to Attorney Mansfield." The trial court apparently disbelieved the statement by the

defendant's husband to the effect that he had advised Detective Corey of the message from her attorney that the attorney "wanted to talk to her before she talked to anybody," resolving the factual dispute in the testimony of the witnesses in favor of that of Detective Corey. As the State points out, it is well established that it is the function of the trier of fact, and not the court of review, to determine the credibility of witnesses and, where the evidence is merely conflicting, a reviewing court may not substitute its judgment for that of the trier of fact (*People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744). In view of the trial court's finding, which we are not at liberty to contravene, the record does not support the conclusion that law-enforcement personnel here engaged in improper or questionable behavior. Thus, the instant case presents a situation unlike the situations addressed in *Smith, Holland,* and *Moran.* We are not presented with a refusal by police to grant access to a defendant or with a failure by police either to inform a defendant of counsel's efforts to speak with him or to convey information to him from counsel prior to interrogation. Because of the trial court's finding we are not presented with knowledge by police of counsel's efforts to convey a message to the defendant. Here the attorney testified that he had not attempted to see the defendant or to reach her by telephone but had given a message for her, to be conveyed by her husband, that she was not to talk to police or anyone else about the case. Detective Corey testified, and the trial court apparently believed, that the defendant's husband had apprised him of no such message. No other law-enforcement personnel are claimed to have known of the message. If this case were one in which the police had engaged in improper or questionable conduct, we would, however, decline to follow *Holland* and would follow *Moran* for the reason that our supreme court followed available Federal law in reaching its decision in *Smith* and we believe would, likewise, follow *Moran.* We note that the court in *People v. Skozen* (1986), 142 Ill. App. 3d 515, 491 N.E.2d 1352, decided prior to *Holland,* found *Moran* controlling in holding that the defendant there had effectively waived his right to counsel. Inasmuch as the defendant makes no contention that the waiver was for any other reason invalid and the record supports no such contention, we affirm the trial court's denial of her motion to suppress the statement made to Detective Corey on December 6, 1984.

■■ ■ With respect to the issue defendant raises concerning the correctness of the trial court's requiring her to make restitution to Resort Air in the amount of $396, she asserts that while evidence

was presented to show that the transaction had taken place, no evidence was presented to show that Resort Air had suffered any "actual out-of-pocket" expenses or losses resulting from the transaction, pursuant to section 5—5—6(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—6(b)). Defendant contends that there was no evidence indicating that Resort Air had ever honored the ticket or had been unable to sell a similar ticket because of her conduct and that, inasmuch as restitution is limited to the actual loss to the victim of a crime (*People v. Allen* (1983), 119 Ill. App. 3d 186, 456 N.E.2d 336), the trial court's order of restitution to Resort Air should be vacated. However, the evidence shows that on October 15, 1984, the defendant gave the check in question without authority to do so in the amount of $396 on an account that had been closed in exchange for airline tickets costing $396 issued by Resort Air. For purposes of calculating restitution, the loss to the victim is the value of that which was obtained from the victim as a result of the criminal conduct. (See *People v. Wilson* (1980), 87 Ill. App. 3d 544, 408 N.E.2d 1209, *cert. denied* (1981), 451 U.S. 989, 68 L. Ed. 2d 848, 101 S. Ct. 2327.) Inasmuch as the value of that which was obtained from Resort Air appears from the record to have been $396, the trial court did not err in ordering restitution in that amount in the absence of further evidence at any point in the proceedings, including the sentencing hearing.

■ With respect to the issue defendant raises concerning the fine imposed of $25 to be paid to the "crime victim's fund," the defendant contends and the State agrees that she should have been ordered to pay a fine of $20 pursuant to section 10(b)(2) of chapter 70 (Ill. Rev. Stat. 1985, ch. 70, par. 510(b)(2)) since the crime of which she was convicted was not a crime of violence. The amount of the fine imposed is hereby reduced from $25 to $20.

Affirmed as modified.

KARNS, P.J., and KASSERMAN, J., concur.